479 F.Supp. 120 (1979)
Robert W. KELLEY, Individually and representative of the class
v.
METROPOLITAN COUNTY BOARD OF EDUCATION OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, et al.
Henry C. MAXWELL, Jr., Individually and representative of the class
v.
METROPOLITAN COUNTY BOARD OF EDUCATION OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, et al.
Civ. A. Nos. 2094, 2956.
United States District Court, M. D. Tennessee, Nashville Division.
August 27, 1979.
(Rendered Orally August 24, 1979)
*121 Avon N. Williams, Jr., Richard Dinkins, Nashville, Tenn., for plaintiffs.
William R. Willis, Jr., Marian F. Harrison, Nashville, Tenn., for defendants.

MEMORANDUM
WISEMAN, District Judge.
This twenty-four-year-old case is before this Court upon a series of motions and petitions by both the plaintiffs and defendants. The various motions, petitions, and pending matters and dates of filing are as follows:[1]
1. March 17, 1972: Defendants' request for approval of construction of White's Creek Comprehensive High School, included in March 17, 1972, report to this Court and merged into July 24, 1978, petition, listed infra.
2. May 30, 1973: Petition by defendants for approval of long range plan, dealing with twenty-six building projects. This petition has essentially merged into more recent pleadings.[2]
3. May 31, 1973: Defendants' petition for approval of portables for use in kindergartens. No action was taken by the Court in regard to this petition and the defendants subsequently implemented the proposed plan.
4. October 14, 1976: Defendants' motion to amend their May 30, 1973, petition for approval of long range plan. Such motion proposed a new location for the Goodlettsville-Madison High School and asked the Court for approval of construction of that school.
5. December 27, 1976: Plaintiffs' petition for contempt and further relief. Plaintiffs therein moved that defendants be held in contempt for their plan to construct the Goodlettsville-Madison High School, the expansion of Hillsboro, Bellevue, Hillwood, Glencliff, Stratford, and Maplewood high schools, the use of portables for kindergartens, the establishment of the Cole Annex for Cole Elementary School grades five and six at the old Turner School, and the proposed closing of Pearl High School. The Board of Education subsequently rejected the proposal to close Pearl. In this petition, plaintiffs also asked that the Court modify its 1971 order to equalize the burden placed on black and white children as a result of bussing, to compel defendants to maintain a black-white staff ratio commensurate with the black-white student ratio, and to force defendants to upgrade Pearl High School and inner city schools. Finally, plaintiffs requested attorneys' fees.[3]
6. July 24, 1978: Defendants' petition for approval of school attendance zones for 1978-79, as amended August 18, 1978. In this petition, defendants requested court approval of the expansion of Hillsboro, Hillwood, Overton, Maplewood, Glencliff, and Stratford into comprehensive high schools with grades nine through twelve, the addition of grade nine to Cohn and Pearl high schools and to McGavock Comprehensive High School, the opening of the Whites Creek Comprehensive High School to include grades nine through twelve, the elimination of one grade schools, the changes in zoning to alleviate overcrowding and to close inadequate buildings, the plan to develop an inner city comprehensive high school, and the establishment of junior high schools including grades seven and eight with feeder systems into the high schools.[4]
*122 7. August 28, 1978: Plaintiffs' amendment to petition for contempt and for further relief, previously filed on December 27, 1976, and discussed supra. Plaintiffs therein allege that construction and expansion of schools in predominantly white areas, and the closure of formerly black schools in the inner city, the institution of optional transfer programs, discussed infra, and the failure of defendants to increase the black-white faculty ratio are violative of the 1971 court order.
8. August 7, 1979: Plaintiffs' motion for contempt, which charged that defendants had violated the Court's order directing defendants to terminate the optional transfer plan, discussed infra.
In pretrial conferences held with all parties, the Court divided the matters into four phases:
Phase 1: Historical recapitulation of school integration since the order of 1971; consideration of the Long Range Plan of the school board; consideration of the proposed zoning for school year 1978-79 (now moot since the year 1979-80 was only one month away at the time of the hearing); consideration of the Board's request to proceed with certain construction projects.
Phase 2: Consideration of matters relating to racial mix of staff and faculty.
Phase 3: Consideration of all petitions for contempt.
Phase 4: The matter of attorneys' fees.
The Phase 1 hearings began on June 26, 1979, and continued on June 27, 28, 29, 30, 1979, and July 2, 3, 5, and 6, 1979. The proof on Phase 1 overlapped substantially with the matters of Phase 3.
At the conclusion of this hearing, the Court directed the defendant, Board of Education, to reconsider its entire plan assuming no parameters heretofore ordered by the Court, but with the primary objective of the achievement of a unitary school system for the entirety of Davidson County. In addition, the Board was instructed to consider: maximum utilization of existing buildings (specifically including those in the inner city); economic factors of transportation costs and fuel economy; time and distance involved in transportation; and any other factors which would impact upon the ultimate objective of a quality educational opportunity for all children in Davidson County through a unitary school system.
The defendant Board has advised the Court that the foregoing request of the Court is a massive undertaking which, if approved by the Court, will represent a substantial redrawing of zone lines and transfer of numerous students.
From the proof adduced on Phase 1 of the hearings, the Court finds the following:
1. The perimeter line drawn by the Court in 1971, by which no requirement of either transportation or attempts at racial balance was mandated outside the perimeter, has encouraged white flight to the suburbs and to those school zones unaffected by the 1971 order. The combined effect of the order and the flight therefrom, either to suburban public schools or to private schools, has been:
a) that inner city schools have become progressively resegregated;[5]
b) that the projected ideal ratio of 15 percent to 35 percent black population in each school has become increasingly more difficult to meet;

*123 c) that the school facilities outside the Court-ordered perimeter have become increasingly inadequate to accommodate the growing student bodies.
2. The resegregation, resulting, at least in part, from the nonetheless good faith efforts of the School Board in the implementation of the Court's order, amounts to a de jure segregation.
Recognition of the above results impels a complete reexamination of the remedy fashioned in 1971. As the United States Supreme Court has said,
The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation. There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. . . . Moreover, whatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed. . . .
Green v. School Bd. of New Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689, 1695 20 L.Ed.2d 716, 724 (1968). See also Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 19-21, 91 S.Ct. 1267, 1278-79, 28 L.Ed.2d 554, 569-70 (1971).
Although any delay in achieving an adequate remedy to a situation in which Davidson County children are deprived of constitutional rights is distasteful, the alternatives and the most appropriate remedy among such alternatives have not yet been the subject of proof in this case at this time. The Court is therefore left with the equally untenable choices of a further year's delay or a haphazardly hurried construction of partial patches which would undoubtedly worsen the situation. The problem faced by the parties in this suit, by this Court, and by the citizens of this county is of paramount importance. It deserves the best efforts at resolution that can be mustered by everyone concerned. It is a subject upon which the best minds available to the parties, including input from the many well-motivated, thoughtful citizens of the community, should be sought and received. The 1979-80 school year is less than a week away. Massive restructuring of zones at this time would be chaotic. For all of these reasons, delay, however undesirable, becomes the only option available to the Court. The proposed zones of the Board for the year 1978-79 are approved for use in 1979-80. Over the coming year, this Court will hear from the parties, and invites amicus briefs by groups such as the Citizens Advisory Committee, Parent-Teacher groups, and any other interested group. The Court encourages such groups to submit proposals which are designed to achieve a unitary school system in Davidson County and to provide the best possible educational

 Black Students/ White Total
 Percentage Black Students Students
1970-71 1212 (100.0) 0 1212
1971-72 599 ( 62.9) 353 952
1972-73 603 ( 66.4) 305 908
1973-74 594 ( 68.4) 274 868
1974-75 558 ( 74.7) 188 746
1975-76 551 ( 72.5) 208 759
1976-77 551 ( 75.8) 175 726
1977-78 492 ( 83.1) 100 592
1978-79[*] 577 ( 96.6) 20 597
Projection
1979-80 532 ( 96.6) 19 551

*124 opportunity for all of the school children of the county.

The Optional Transfer Policy
In 1978 the School Board adopted a transfer policy which permitted any student assigned to a non-comprehensive high school to opt out automatically of such school to a comprehensive high school (Exh. 21). At the July hearings, it became evident to the Court that this provision had been utilized extensively by white students assigned to Pearl to escape such assignment. The percentage of automatic options out of Pearl compared to those from other non-comprehensive high schools leaves no other credible inference.[6] The effect of this policy upon the already-established trend toward resegregation at Pearl was disastrous. From the 1977-78 school year to the 1978-79 year, the black to white ratio went from 83.1 percent to 96.6 percent (Exh. 87).
At the hearings in July, when the foregoing facts became apparent, the Court orally enjoined the Board of Education from further implementation of this transfer policy. The Court's directive from the bench was:
I am making this ruling now, Mr. Willis, because as I see the urgency of the situation that has arisen during the course of the proceedings, I think I need to do that because you need to know what I am *125 deciding on in the 1978-1979 [sic][7] school year. I think it is going to take considerable work by the School Board on this ruling because it is going to move several hundred students or determine from them whether or not there is a bona fide reason for program transfers and in anticipating it on a program transfer basis rather than an automatic opting out. So, I am telling you that now, so you have plenty of time to work on it, we will continue to do that as we can through this hearing. I will supplement all of this in a written memorandum and give you a chance for appeal and whatever. When I see something I need to address in order to be ready for the 1978-1979 [sic] school season, I will address it.
Thereafter, on August 7, 1979, plaintiffs filed a petition for contempt alleging that the Board had failed to implement in good faith the Court's order. This petition was scheduled for the first order of business at the resumed hearings which began August 21 and continued through August 24, 1979.
From information provided through discovery, plaintiffs introduced statistical summaries of transfers approved, broken out by sending school, receiving school, and by race (Exh. 98). From this exhibit it appears that 326 white students have had transfers approved from Pearl to other high schools in the system. Sixteen blacks and twelve persons of other races were granted transfers from Pearl. All of the transfers from Pearl were subject matter based. The number of transfers from other non-comprehensive high school were:

 White Black Other
From Joelton 134 0 0
From Cohn 85 25 2
From Antioch 38 1 0
From Dupont Sr. 32 0 0
From Madison 31 3 0
From Goodlettsville 23 8 0

The impact of these transfers upon the racial mix at Pearl was dramatic. Children assigned to Pearl by applicable residential zones should have produced a racial mix of:
 532 white (52%)
 36 other ( 3%)
 461 black (45%)
After the approved transfers were granted, the resulting totals and percentages were:
 206 white (30%)
 24 other ( 4%)
 445 black (66%)
Additional transfer requests are pending from Pearl of 78 white, 17 black, and 4 other (Exh. 142). If these transfers are approved, the white population will be reduced to 22 percent.
The apparent mass exodus of white students from Pearl under the subject matter transfer raised a serious question in the Court's mind as to the extent of monitoring which defendant Board had exercised in its implementation of the spirit if not the letter of the Court's enjoinder from the bench in July. From the statistical evidence above, the Court found a prima facie case of contempt to have been made and shifted the burden of going forward with the evidence to the defendants.
The School Board explained its procedure in implementing the Court's order as follows:
1. The School Board was informed at its July 10 meeting of the Court's order and the need for modification of the Board's policy.
2. The Board at its July 24 meeting rescinded its optional transfer policy. Dr. Elbert Brooks, Director, Metropolitan Schools, stated to the Board that "students who had made these automatic transfers would be assigned to their original zoned school but would be permitted to request a transfer in order to take a particular program/subject not offered at the student's assigned school."
3. A form letter was developed and signed by Dr. Brooks and sent to all students *126 who for the school year 1978-79 had been assigned to a non-comprehensive high school but had opted to a comprehensive high school under the "automatic option" policy (Exh. 96).
4. A Transfer Committee was established consisting of Mr. Joe Garrett, Chairman, Pupil Accounting and Transfers, Pupil Personnel Services; Dr. Cornell Lane, Psychology, Pupil Personnel Services (a black member); Mr. Bill Hollingsworth, Attendance, Pupil Personnel Services; and Mr. Dan Covington, Vocational and Technical Education. A directive was issued by Dr. Brooks requiring that requests for transfer be forwarded to the office of Mr. Garrett for review by the Transfer Committee. After such review the two affected principals and the students were to be notified.
5. Principal Carnes of Pearl High testified he was informed at two meetings held with other principals and his district superintendent that his sole function was to determine if the requested course was available at his school and, if not, to sign off on the request. This instruction was reiterated by Dr. Brooks in a phone call after a school board member relayed parent complaints to Dr. Brooks about Mr. Carnes' handling of transfer requests. Somewhat inconsistently, the testimony also showed that Mr. Carnes understood and Dr. Brooks also reiterated to him his responsibility to counsel with the student and parents concerning such a transfer.
At some point after the transfers began to be requested, the form for such applications was changed. The material change was the deletion of an addendum which listed courses taken in the previous year, grades received, and courses desired this year. It also required a statement that the program of studies had been discussed with both the principal and guidance counselor and an explanation thereof. Finally, it required a selection of a course not offered at the assigned school and a statement of how the requested course would be beneficial to the student. No satisfactory explanation of the changes in the form was offered by defendants.
Notably after the fact, after the filing of the petition for contempt, Dr. Brooks required a comparison of the subject/program transfers granted with the students preregistration desires indicated last spring (Exh. 137). This comparison as it relates to transfers from Pearl reveals the following: *127
*128 It is apparent from this summary that 69.4 percent of the transfers from Pearl to Hillsboro, 90.3 percent of the transfers from Pearl to Hillwood, and 80 percent of the transfers from Pearl to Glencliff were facially bona fide under the policy of the Board and the understanding of Dr. Brooks, discussed infra. In the case of the one white transfer from Pearl to Glencliff wherein the fall course selection was not selected in the spring, and the spring selection is similar to a course offered at the sending school, and in the case of those 38 transfers to comprehensive high schools in which all courses selected in the spring are offered at Pearl, the transfers are facially suspect.
Dr. Brooks testified that a follow-up interview will be scheduled with each of these individuals in the suspect category in an effort to determine the bona fides of the students' expressed desires. Such a monitoring is consonant with the policy adopted in 1977 by the Board in Section IV(F)(4) of the Student transfer Policy # 5119: "Special transfer requests having evidence of course or program selection and changes in courses scheduled for the purpose of school reassignment will not be approved" (emphasis added).
Dr. Brooks further testified that, in his opinion, there is no reliable way to explore the legitimacy of a subject/program transfer except after the fact. In pursuance of this belief, the chairman of the Transfer Committee developed a three-part monitoring plan, to which Dr. Brooks added a fourth, by which the Board will follow the progress of each transfer student in the requested courses (Exh. 139). Actual enrollment is to be verified and progress checked at six-week and semester intervals and evaluated for renewal of transfer.
The Board's actions before the filing of the contempt petition leaves much to be desired. Dr. Brooks admitted in hindsight that the comparison with spring course selection should have been examined before the fact rather than after. The Court believes that the use of the longer form, changed in midstream apparently in the interest of time, would have produced information for a more objective evaluation of the bona fide nature of the application for transfer.
The statistical evidence of transfers of white students from Pearl gives rise to the inescapable inference that white students, given the opportunity to automatically opt out of the Pearl zone last year, certainly did not wish to return. Perhaps many of these represent legitimate desires to attend a comprehensive high school and take courses offered there but not at Pearl. Black children are not exercising this program/subject opportunity in nearly the equivalent numbers or percentages, however. This may be due in part to a corresponding desire by black students to attend a majority black school; it may be related to the ethnic pride of the black community in Pearl High as an institution. For whatever reason, it is a fact evidenced by the admitted statistics of both 1978-79 and 1979-80 transfers.
The Board has adopted, as a part of its long range plan of construction of comprehensive high schools, a plan to construct an inner city comprehensive high school, to be named Pearl, and at a location either on the present site or at some place in the North Nashville area. Originally, the Board had gone forward with the recommendation of the staff for the closure of Pearl, Cohn, and Joelton high schools upon the theory that none of these locations fit into the judicially imposed directive to locate comprehensive high schools in areas which would encourage and facilitate an integrated school system. Objections by the black community to the closure of Pearl brought about a reversal of this decision within the past year.
Another factor which has impinged upon the School Board's action in regard to Pearl, as well as other non-comprehensive high schools in the system, is the requirement by Tennessee law that all students in grades nine through twelve be given access to a comprehensive high school education by 1978 (T.C.A. §§ 49-2701 et seq.). As long as Pearl and other non-comprehensive high schools were either scheduled for closure or had not yet been converted to a comprehensive *129 facility, the Board felt obligated to provide the "automatic option," or at least the program/subject option on an "as required" basis.
The subject matter/program transfer plan was "loosely conceptualized and leniently administered." (Testimony of Dr. Scott). The Board of Education did not follow its own policies relating to subject matter transfers, specifically Sections IV(A) and IV(F) of the Student Transfer Policy # 5119. No preapproval screening was done to determine how the requested subject fit into a student's career objectives. No effort was made to ascertain if the requested subject correlated with the student's career objectives expressed at spring registration or if, in fact, any change had taken place in those career objectives by the fall registration. No guidance counseling input was sought or received before approval was granted. Transfer approval was automatic if the requested course was not offered at the sending school and if such course was not already full at the receiving school. No effort was made to tabulate course requests and to determine if a sufficient demand existed to establish the requested course as an offering at the sending school. For instance, in applications to transfer away from Pearl, there were at least 38 requests for horticulture, 18 requests for German history, 38 requests for media arts, 34 for computer programming, and 22 for vocational cluster. Such numbers would seem sufficient to establish classes in these subjects at Pearl. It would have been both feasible and reasonable to include a question on the request for transfer form inquiring whether or not the student would be willing to take the requested course at Pearl if it were offered there after a sufficient expression of interest. Such an inquiry was not made.
The looseness of the administration of the subject matter/program transfer policy and its pro forma approval can have no other effect than to emasculate any efforts at desegregation. Zoning becomes a farce under the expressed attitude of Dr. Brooks as to his understanding of a student's automatic right to course offerings at another school. Many of these courses have no relationship whatsoever to the vocational program outlined in T.C.A. §§ 49-2701 et seq. As this Court reads that law, the variety of vocational offerings in the Metropolitan School System is not required to be duplicated at every school nor is every student required by this law to be given access to every course at every school.
The Court finds that the school board policy for subject matter/program transfers, although racially neutral on its face, by the manner in which it has been implemented and the inherent potential for abuse in its conceptualization, has a negative impact upon the desegregation efforts of the School Board pursuant to the previously issued order of this Court, and violates the spirit of the 1971 order, and the spirit of the order of this Court issued orally on July 2, 1979.
The Court, however, does not find defendants in contempt of the July 2, 1979, order of this Court. In that order, the Court directed defendants to abolish the optional transfer plan. It is indisputable that defendants complied with that order. In the July 2, 1979, order the Court did not deal specifically with the subject matter/program transfer plan, which was the central issue of the recent hearing. As the Court of Appeals for the Sixth Circuit has recently held, "The notice of a judicial order upon violation of which a contempt finding may properly be based is such notice as would clearly tell a reasonable person what he is required to do or abstain from doing." Reed v. Cleveland Bd. of Educ., 607 F.2d 749, 752, (6th Cir. 1979). It would violate due process to hold defendants herein in contempt for their implementation of the subject matter/program transfer plan when the Court did not address the matter with that degree of specificity necessary under the standard hereinabove set out.
It is, therefore, ORDERED that:
1. The School Board reexamine and submit to this Court for approval by September 7, 1979, a revision of its subject matter/program *130 transfer policy designed to provide methods by which transfer applications may be objectively judged prior to approval, to determine their validity in the educational objectives of the individual student, as opposed to a subterfuge on the part of a student to escape a given school or subvert the zones established for the purpose of achieving a unitary school system.
2. The School Board shall conduct a review of each of the transfer applications that have been heretofore approved as well as those now pending. Such a review will include an interview with both the student and parent or guardian. After such review, the Board will make written findings in each case of the validity of the request. A procedure will be established to obtain the recommendation of the principals from the sending and receiving schools and the judgment of the transfer committee. Such a procedure will also make provisions for an appeal to the Director. The decision of the Director, on appeal, shall be in writing and shall include the supporting reasons for his decision. Such a review of all previously granted requests will be made by September 7, 1979. The defendants will give first priority to reviewing those previously granted requests for transfers out of Pearl High School.
3. By September 7, 1979, the School Board shall submit to the Court for its approval recommendations relating to a plan to establish additional classes at Pearl and/or other non-comprehensive high schools when the number of requests for transfers from such sending schools are sufficient to justify the establishment of such classes. This order does not suggest or require the conversion of all high schools into comprehensive high schools. The Board will necessarily make value judgments between establishing courses such as computer sciences or vocational clusters, on the one hand, which may not be economically feasible to develop at, for example, Pearl, and establishing courses such as German history, horticulture, and guitar, which would not require mass expenditures if such courses were offered at Pearl.
4. Those students whose requests for transfer have been heretofore approved will register at and begin attending the school to which they requested to be transferred. The School Board shall reassign to the schools to which the students were originally zoned those students whose requests for transfer the transfer committee and/or the Director finds to be less than bona fide and reassign to the original zoned school those students who requested a course subsequently offered at that school, under paragraph three of this order.
5. Those students whose requests for transfer are pending and those students who have not yet requested transfer will register at and attend the school to which they were originally zoned until such time as the defendants evaluate their requests for transfer under the revised plan.
6. Pursuant to the order and memorandum, filed August 27, 1979, the defendant Board may grant the application of any senior (as defined in that memorandum opinion), who requests transfer from a high school to which he is zoned to the high school to which he attended as a junior in the year 1978-79.
The Court does not intend to alter the provision of the 1971 Court order, incorporated in Section XI of the Board's policy # 5119 (Exh. 21), that allowed students to transfer from "majority to minority" schools. Such provision has previously permitted a student, who is a member of the majority race in a particular school, to transfer automatically, without a program related reason, to the closest school in which that student would be a member of the minority race. The Court, however, will not condone transfers from, for example, Pearl, by white students in grades nine through eleven, when the effect of such a transfer will be to convert the majority at the sending school into a minority, or convert the minority at the receiving into a majority. The Board shall allow any student to transfer from a school in which he is presently in a majority to any school in which he would be at that time a member of a minority, in accordance with the defendants' *131 previous majority to minority plan. If, however, by the operation of the revised transfer plan and/or the majority to minority plan, the racial mix is altered so that a student in grades nine through eleven would not be transferring from a school in which he is presently a member of a majority to a school in which he would be at that time a member of a minority, the majority to minority rule will not justify approval of a request to transfer.
The Court recognizes that the foregoing directives are temporary and will be obviated by the completion of the comprehensive high school program.

MEMORANDUM
Defendants have moved this Court to exclude those students who will be seniors in the year 1979-80 from the Court's order of August 24, 1979, relating to subject matter/program transfers. Plaintiffs have responded in opposition to defendants' motion.
In her affidavit attached to defendants' motion, Dr. Peggy Harris, research assistant for defendant Board of Education, states that the sixty-six white students, designated as seniors for the year 1979-80, have requested and been approved for transfer from Pearl to a comprehensive high school. This figure represents approximately 20 percent of the 326 white students in grades nine through twelve, originally zoned to Pearl, whose requests for transfers out of Pearl have been approved (Exh. 98). In addition, Dr. Harris stated that there were presently thirteen requests for transfer out of Pearl from white seniors whose applications were pending decision by defendant Board.
In defendants' motion, they note the testimony elicited at the recent hearing from Leslie Carnes, Principal of Pearl High School, and Dr. Elbert Brooks, Director of Metropolitan Schools, regarding the special status of seniors who may have bought senior rings and made plans to participate in athletic and extracurricular activities. Plaintiffs, however, point out that the problems of seniors were not the subject of extensive proof at the hearings. They, therefore, argue that the special situation of each senior should be evaluated by the defendant Board on an individual basis when the Board reconsiders its prior grant of approval of transfer requests and initially considers pending transfer requests. Although plaintiffs contend that it is not equitable to permit those who have achieved a wrongfully acquired status to profit from such status, they also appear to be sensitive to the potential special needs and problems of seniors.
This Court has found that the previously utilized optional transfer plan and the Board's recent implementation of the subject matter/program transfer plan had a debilitating effect on desegregation efforts in this school system. Toward the end of halting the rapid trend of reversion to an almost totally black inner city school, the Court ordered that the optional transfer plan be terminated and the method by which the program transfers were granted be radically revised so that program transfers could be based on bona fide educational reasons rather than on a means to escape a traditionally black, inner city school.
The Court has attempted to fashion a remedy that will eliminate the negative effects of the previous policies of defendant Board. In fashioning such a remedy, however, it is the Court's responsibility to balance the relative detriments and benefits to the school children, who will be affected by the Court's order. The Court cannot decree in a theoretical void; it must be cognizant of the specific situations involved and the harm that may befall individual children. The Court is not insensitive to the special status of high school seniors who have made plans according to the assumption that they would be attending the same school for their last year as they attended their junior year. Such plans may have entailed expenditure of money for class rings and senior pictures, and a commitment to participate in, inter alia, athletic and band activities, school clubs, and student government. To destroy a student's plans for the last year of high school and to wrest him away *132 from the school he has known and the friendships he has developed has the potential for thwarting a child's academic and social adjustment and fulfillment of his educational goals. To uproot a child who has spent at least the last year in anticipation of completing his high school education in the same environment offends this Court's sense of justice. The potential harm in such upheaval weighs heavily in favor of an exclusion for seniors from the revised transfer plan.
The Court, therefore, grants defendants' motion to exclude seniors from the Court's order of August 24, 1979. The Court will permit the defendant Board to grant the application of any senior who requests transfer from a school to which he is zoned to the high school to which he attended as a junior in the year 1978-79. The Court adopts the definition of "senior" used by defendants as any student who, based on his number of credit hours, is capable of graduating from high school during the regular school year of 1979-80 plus the summer school term of 1980. An exemption for seniors will be incorporated into the final version of the Court's order of August 24, 1979. This order of exemption of seniors from the revised program transfer plan will be in effect only for the year 1979-80, and will not be extended beyond that year.
NOTES
[1] Throughout the pendency of this case until and during the recent hearings, the parties have filed various motions relating to discovery matters. The Court has ruled on substantially all discovery issues as they have arisen. Such matters are, therefore, not listed above as pending motions.
[2] Subsequent to the May 30, 1973, petition, defendants have filed various letters to inform the Court of their plans and actions taken relating to the projects detailed in the petition.
[3] Plaintiffs had previously filed motions for attorneys' fees on February 8, 1974, and April 11, 1975, as well as a motion to dispose of those motions, filed on October 16, 1975.
[4] On May 29, 1979, defendants filed an amendment to the list of capital improvements and to proposed attendance zones, in which plaintiffs deleted from the May 30, 1973, petition a request for approval for an Interstate 40 West comprehensive high school, and substituting a plan for an inner city comprehensive high school, and modified the proposals relating to Antioch, Dupont, and Bellevue high schools. On July 6, 1979, the Court granted the defendants' amendment to their request for approval of certain building projects, in which defendants withdrew their request for approval of construction of Antioch High School, the Glengarry Elementary School project, the Jordonia-Wade Elementary School project, and omitted the projects proposed for Dupont and Bellevue high schools.
[5] The most dramatic example of such resegregation can be seen in enrollment statistics for Pearl High School for the school years 1970-71 through the projections for 1979-80, compiled in Exhibit 87, as follows:
[6] Exhibit 20 itemizes the number of students who transferred to a comprehensive high school from non-comprehensive high schools in 1978-79 under the optional transfer program. Interpolating these figures to reflect the number of students transferring from Pearl and other non-comprehensive high schools to comprehensive high schools, the resulting chart is as follows:

 School White Black Other Total
 From Pearl 290 21 12 323
 to Glencliff 34 0 0 34
 to Hillsboro 35 10 2 47
 to Hillwood 220 8 10 238
 to Overton 1 3 0 4
 From Antioch 62 5 0 67
 to Glencliff 62 5 0 67
 From Apollo Jr. 50 1 0 51
 to Glencliff 50 1 0 51
 From Bellevue 8 0 0 8
 to Hillsboro 8 0 0 8
 From Cohn 66 19 0 85
 to Hillsboro 31 14 0 45
 to Hillwood 35 5 0 40
 From Madison 47 2 0 49
 to Maplewood 1 0 0 1
 to Whites Creek 46 2 0 48
 From Dupont (Jr. & Sr.) 37 4 0 41
 to McGavock 37 4 0 41
 From East 10 3 0 13
 to Stratford 10 3 0 13
 From Goodlettsville 68 5 0 73
 to Whites Creek 68 5 0 73
 From Joelton 149 0 0 149
 to Whites Creek 149 0 0 149
 From Neely's Bend 3 0 0 3
 to Whites Creek 3 0 0 3
 Total 790 60 12 862*
* Exhibit 20 also reflects that 11 white students transferred from Hillsboro to
Hillwood. Since those transfers are not from non-comprehensive schools to comprehensive
high schools, they are not listed in the above chart.

[7] The Court erroneously referred to the school year 1978-79. The Court, of course, intended to refer to the school year 1979-80.
[*] 9th Grade Added