Robert W. KELLEY et al.

v.

METROPOLITAN COUNTY BOARD OF EDUCATION OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, et al.

v.

STATE OF TENNESSEE et al.

Nos. 2094, 2956.

United States District Court,
M. D. Tennessee,
Nashville Division.

April 17, 1981.

Avon N. Williams, Jr., Richard Dinkins, Nashville, Tenn., for plaintiffs.

William R. Willis, Jr. and Marian F. Harrison, Nashville, Tenn., for defendant Metropolitan Bd. of Ed.

Frank J. Scanlon, Senior Asst. Atty. Gen., Nashville, Tenn., for third-party defendant State of Tenn.

### MEMORANDUM

WISEMAN, District Judge.

This Court's Memorandum Opinion and Order of May 20, 1980, directed the Defendant Board of Education to develop a new desegregation plan following certain specific directives and guidelines regarding educational components and pupil assignment as set forth in that Opinion.[1] Those directives and guidelines resulted from many days of testimony beginning in the summer of 1979, and culminating in over 25 trial days in March and April of 1980. After the lengthy hearings, this Court determined that a different remedy for the remaining vestiges of segregation in Nashville was required, in view of the "tortuous twenty-five year history of desegregation efforts in Metropolitan Nashville," and the specific burdens and benefits found to emanate from the *Swann* remedy ordered by this Court and implemented by the Defendants in 1971. This Opinion considers the plan offered in the Board's effort to comply with the May 20, 1980, Order, and the Plaintiffs' proposals and objections relating to the ordered plan.

### THE RECORD PRIOR TO THE 1981 HEARINGS

Prior to this Court's Order of May 20, 1980, many matters had gone unresolved in this litigation since 1971.[2] The Plaintiffs had filed several objections to the operation of the Court-ordered 1971 plan, which objections were addressed primarily to alleged disparate burden in transportation of young black children. As a result of these objections, along with other factors such as the Board's need for additional classroom space in the outlying areas not involved in the 1971 plan,[3] and the ever-increasing costs of transportation under the plan, the Court ordered the Board, on August 27, 1979, to develop a new desegregation plan for the entirety of Davidson County.[4] After many weeks of Board deliberation and community input at the Board level, the "Waldrip Plan"[5] was presented for the Court's scrutiny. The Plaintiffs were invited by the Court to submit an alternative plan, but this offer was ultimately declined. Instead, the Plaintiffs chose to rest their case on specific criticisms leveled at the Waldrip Plan by the Plaintiffs' expert witness, Dr. Hugh Scott. A group of intervenors were also permitted to file a plan.

Consideration of the two plans, along with the Plaintiffs' objections, resulted in the Court's rejection of both plans, and in the Court's directive to the Board to develop another plan following the specific guidelines set forth in the Court's Opinion. Based on the testimony offered during the hearings on the two plans, this Court made an effort to carefully balance the benefits and burdens imposed by the *Swann*-type remedy employed in the 1971 Order and in the Waldrip Plan, and set forth the following directives for inclusion in the new Board proposal:

1. *See, Kelley v. Board of Education,* 492 F.Supp. 167 (M.D.Tenn.1980).

2. *Kelley v. Board of Education,* 492 F.Supp. 167, 168–75 (M.D.Tenn.1980).

3. The 1971 *Swann* remedy left a ring of schools in the outlying areas untouched by the plan because of the distances involved in transportation to and from these schools.

4. *Kelley v. Board of Education,* 479 F.Supp. 120 (M.D.Tenn.1979).

5. The planning team for the Board was headed by Dr. Donald Waldrip, whose qualifications were set forth in the Court's Memorandum Opinion of May 20, 1980. *Kelley v. Board of Education,* 492 F.Supp. 167, 177 (M.D.Tenn. 1980).

I. *Educational Components.*

A. Intercultural experiences for children in predominately one race schools.

B. Reduced pupil-teacher ratios in schools having achievement levels below the average for the system.

C. Remediation efforts in schools or classes made up largely of socioeconomically deprived children who suffer the continuing effects of prior discrimination.

D. Black history and black culture curriculum.

E. Teacher in-service training in preparation for the implementation of the plan.

F. Magnet school(s) offering unique educational opportunities.

G. Middle school programs.

II. *Pupil Assignment.*

A. A three-tiered system of grades utilizing K–4, 5–8, 9–12, or some reasonable variation thereof.

B. Schools having a neighborhood character for the lower elementary grades without the use of non-contiguous zoning arrangements.

C. Middle schools having a minimum 15% representation of either race, utilizing non-contiguous zoning where necessary.

D. Use of the closest other race population for necessary non-contiguous zones.

E. High school zones in conformity with the Court's directive, including closing and/or changing the use of Bellevue, Joelton, DuPont, Antioch, Madison, Pearl, and Cohn high schools.

F. Construction of the Goodlettsville-Madison and Pearl-Cohn comprehensive high schools, with the corresponding closure or change in use of Goodlettsville, Madison, Pearl, and Cohn.

G. Delay the addition to Maplewood High School and consider adjustments to the Whites Creek zone and the impact of proposed magnet school enrollments to accommodate the large enrollment at Maplewood.

On June 25, 1980, the Defendant Board of Education made a preliminary report to the Court regarding a timetable for implementation of the Court's Order. Pursuant to what the Board representatives deemed to be the suggestion of the Plaintiffs, the Board's proposed timetable included a plan whereby first graders could remain in the school wherein they attended kindergarten, thereby presumably aiding in the transition between kindergarten and first grade.[6] A hearing was held on the proposed timetable for implementation, and the Plaintiffs objected to the rezoning of first graders during the interim. Following the hearing on July 15, 1980, the Court entered an Order rejecting the first grade proposal, approving the remainder of the timetable for the pupil assignment components, and relieving the Defendants of the obligation to confer with representatives of the Plaintiffs and Intervenors during the planning process.[7]

The Board filed its proposed desegregation plan on January 19, 1981.[8] Following the filing, this Court directed the Plaintiffs and the Intervenors to respond by way of

6. Dr. Hugh Scott, expert witness for the Plaintiffs, testified extensively about the need for a smooth transition between these grades.

7. The Court also ordered the Board to reconsider its decision to permit 12th graders to remain at Bellevue and Joelton, while closing those high schools to other grades pursuant to the Court's directive. The Board subsequently voted to close those schools as high schools for the school year 1980–1981, which was reported to the Court on July 25, 1980.

8. Counsel for the Board noted in a response to the Plaintiffs' later request for additional time to respond to the plan and in the hearings on March 30, 1981, that the Plaintiffs had access to the plan long before January 19, 1981. Specifically, Board counsel stated as follows: De-

tails of the proposed plan were widely aired in public meetings during November and December, 1980. On or about December 15, 1980, after the approval of the long range pupil assignment plan by the Board, a copy of the statistical data supporting the plan was forwarded to the Plaintiffs, and an invitation to view the bulky maps, which had not yet been duplicated, was extended to the Plaintiffs by Board counsel. The entire package of maps and statistical information was forwarded to the Plaintiffs on or about January 12, 1981, with the remainder of the plan, including the interim proposals and educational components, being delivered to the Plaintiffs on January 19, 1981. No exception was taken to this representation of the events by Plaintiffs' counsel.

specific objections to the plan by February 9, 1981. The Intervenors moved for leave to withdraw from active participation in the hearings on the new plan, and this motion was granted.

On or about February 6, 1981, the Plaintiffs moved the Court for additional time to file objections up to and including March 31, 1981. Accompanying that motion was an initial submission of objections, and an indication that the Plaintiffs had not been able to meet with one or more possible expert witnesses regarding the plan. The motion was granted in part, extending the time for responding until March 16, 1981, with the notation that any hearings, if necessary, on the plan and objections would begin on March 30, 1981, and would continue thereafter until concluded.

On March 10, 1981, the Plaintiffs filed a second motion for extension, based on the fact that the Plaintiffs' lead counsel was ill and hospitalized. From this motion, and from a status conference on or about March 10, 1981, attended by Plaintiffs' counsel, this Court and the Defendants learned for the first time that an alternative plan was contemplated by the Plaintiffs. The request for an extension was granted until March 25, 1981, giving the Plaintiffs leave to reapply for an extension if counsel's health had not improved. The Order contained a further notation that hearings remained scheduled for March 30, 1981.

On March 25, 1981, the Plaintiffs filed their supplemental response, along with an alternative plan. On March 27, 1981, the Defendants moved to strike the Plaintiffs' plan and to affirm the Board's plan without a hearing. The Court then ordered a hearing on all pending motions for determination of status of the case for March 30, 1981.

## THE PLAINTIFFS' PROPOSED PLAN

On March 30, 1981, the Court heard the Board of Education's "Motion to Strike Plaintiffs' 'Conceptual' Pupil Assignment Plan and to Approve Defendants' Proposed Plan Without Hearing." The Court construes this motion as one made under Rule 12(f), Federal Rules of Civil Procedure, as a motion to strike "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

The primary basis for the Board's motion to strike the Plaintiffs' plan and certain objections to the Board's plan is that the primary thrust of the Plaintiffs' response constitutes an attack on the Court's Order of May 20, 1980, rather than an effort to produce a plan to comply with the Court's Order. In addition, the Board argues that the Court's Order of May 20, 1980, was in large measure based upon the testimony of the Plaintiffs' own expert witness, Dr. Hugh Scott. An examination of the Plaintiffs' plan and many of their objections reveals that the Board's position is substantially correct.

The Plaintiffs' proposed plan recognizes from the outset that elementary children will be transported long distances outside their neighborhoods, contrary to the Order of May 20, 1980. Furthermore, the elementary pairings were developed so as to closely approximate the current ratios existing in the community. The pairings and clusterings necessitate at least a four-tiered grade structure (which is inconsistent with the position taken by the Plaintiffs at the hearing), with students attending at least two elementary schools, one middle school, and one high school. Some students would attend three elementary schools since kindergarten is often separated from grades one and two. (Exhibit 284, offered for Identification).

In designing their elementary and middle school pairings and clusterings, the Plaintiffs have used the same method rejected by the Court in the form of the Waldrip Plan previously presented by the Board. Both the Waldrip Plan and the Plaintiffs' plan use "more-of-the-same remedy" employed by the Court in 1971, and rejected by the Court in 1980.[9] This Court made a

---

9. This is where that similarity stops, however. The Waldrip Plan was fully fleshed out with improved feeder patterns and as little transportation as possible under a proposed *Swann*-type remedy. This is not the case with the Plaintiffs' plan.

specific factual finding that this remedy is no longer appropriate in Nashville, after carefully weighing benefits against burdens and the nine year operational history of the school system under the *Swann*-type remedy.

A large portion of this Court's Order of May 20, 1980, consisted of this balancing process—weighing the benefits of the *Swann*-type remedy against its burdens. The costs and burdens were largely derived from the testimony of Dr. Hugh Scott, the Plaintiffs' expert witness. He testified to the educational importance of a three-tiered school system, and the deleterious effect of disrupting a child's early education by splitting the primary grades among different schools. He testified further to the importance of parental involvement in early childhood education, which he felt could only be fostered by having the schools in such a location that the parent could frequently visit the school, talk with teachers, become personally involved, and contribute services. He also testified that the "osmosis effect" or "rightness of whiteness" approach to desegregation mandating a given racial percentage in each school and rejecting predominately black schools was inherently racist and without educational validity.

■ This Court was impressed by Dr. Scott's testimony and relied upon it, only to have an elementary school plan proposed by the Plaintiffs which was totally contrary to this most persuasive testimony. Since the elementary portion of the Plaintiffs' plan on its face constitutes nothing more than an attack on the Court's Order of May 20, 1980, and is contrary to the Plaintiffs' own expert proof, it is stricken as impertinent and unresponsive to the Court's directive

under Rule 12(f), Federal Rules of Civil Procedure.

While the obvious failure of the Plaintiffs' elementary school proposal to comply with the Court's Order of May 20, 1980, precluded testimony on that portion, the Court did permit the Plaintiffs to present their middle school plan, which their new expert witness, Dr. William M. Gordon,[10] stated was independent of the elementary school portion.[11]

Throughout Dr. Gordon's testimony, it was apparent that all portions of the Plaintiffs' proposed plan, including the middle school plan, were hastily drawn by consultants [12] who had little or no familiarity with the demography, the major arteries, the location of children, the capacities of buildings, and other pertinent information. Further, the consultants who participated in the drawing of the Plaintiffs' plan did not take time to study these variables or to visit the city for any appreciable length of time. Dr. Gordon admitted that an entire chapter of his book regarding desegregation in America was devoted to the importance of knowing these crucial details regarding a city when preparing a desegregation plan.

The Plaintiffs' middle school plan is superficial at best. The consultants merely paired the Board's proposed elementary zones into middle schools, with a total lack of regard for building capacities and the distances between non-contiguous zones for the schools. No projected enrollments were set forth in the Plaintiffs' plan, and accordingly, it was impossible to evaluate how well the mechanics of the system would work. Mr. Ray Osborne, Director of Zoning and Real Property for the Board of Education, calculated enrollments for the Plaintiffs' middle schools and found numerous schools to be overcrowded.[13]

---

10. Dr. Gordon is a Professor in the Department of Educational Leadership, Miami University, Oxford, Ohio. (Exhibit 280). He is a member of HGH Associates, an educational consulting firm specializing in desegregation plans.

11. The Plaintiffs did not propose an alternative high school plan, thus apparently accepting the Board's proposal for high schools.

12. In addition to Dr. Gordon, see note 10, *supra*, Dr. Larry W. Hughes (Exhibit 281), and Dr. James B. Andrews (Exhibit 282), partici-

pated in the drawing of the Plaintiffs' desegregation plan. Dr. Hughes and Dr. Andrews are also members of HGH Associates.

13. For example, it was calculated that Meigs Middle School would have an enrollment of 1348, with a capacity of 850, that Rose Park Middle School would have an enrollment of 1235, with a capacity of 690, that McMurray would have an enrollment of 1280, with a capacity of 926. Other schools were apparently severely underutilized. For example, Moore

An examination of the map depicting Plaintiffs' middle school plan (Exhibit 266), reveals numerous instances of unreasonable zoning arrangements for both races. For example, students in the Cumberland non-contiguous zone on the Sumner County line would be required to ride to a zone on the Cheatham County line to attend Cumberland. Students in the Antioch non-contiguous area in the innercity would be transported to Antioch in southwest Nashville. Students in the Joy and Stratton areas would be transported across the Cumberland River to Donelson. Students in the Ross area near the central city would be required to ride to Goodlettsville. Other pairings are similarly unreasonable,[14] but in all there is an apparent disregard for distances, for the location of rivers, for bridges, and for major thoroughfares. On cross-examination, Dr. Gordon could not show the Court how a bus would travel from one of these distant zones to another, thereby indicating a total lack of familiarity with such practicalities.

The middle school plan also fails to abide by the Court's Order of May 20, 1980, as well as the testimony of Dr. Scott, the Plaintiffs own expert witness. Indeed, the testimony of Dr. Gordon revealed that his "theory" of desegregation was totally contradictory to that of Dr. Scott. While Dr. Scott had previously rejected the racial balance approach, had attacked the validity of the theory that black children must sit beside white children to learn, and had applauded the idea that black schools were not inherently bad, Dr. Gordon's testimony and the middle school plan presented by the Plaintiffs take the opposite position.

Dr. Gordon and his associates sought specifically to structure school zones reflecting the racial makeup of the community. Blacks are in the majority in only one of the Plaintiffs' proposed 24 middle schools.[15] In drawing the zone lines in this fashion, Dr. Gordon created the impractical transportation routes described above. The Plaintiffs' plan does not comply with the Court's order that middle schools should have a minimum of 15% either race, which was a modification of the racial balance approach based on the Plaintiffs' previous position expressed by their expert witness, Dr. Hugh Scott.

From all of the above, it is apparent from the middle school plan, as from the elementary school plan, that the Plaintiffs have not complied with the Court's Order of May 20, 1980. The plan they have created is at best haphazardly constructed and unworkable. Accordingly, the Plaintiffs' middle school plan is rejected.

### THE BOARD'S PLAN

As the Court decreed in its Order of May 20, 1980, the Board of Education's plan consists of two parts—the educational components and the pupil assignment components.

### I. *The Educational Components.*

The responsibility for developing the educational components was divided into six bi-racial committees of central office staff members, teachers, and citizens, for each of the various sub-components: (1) K–4 remediation; (2) multicultural/intercultural exchange; (3) magnet schools; (4) black history; (5) middle schools. (Exhibit 273). The timetable for development of the various components was approved by this Court on July 15, 1980, and the committees' work has substantially complied with the time frame set forth, with the possible exception of the magnet school proposal discussed more fully, *infra.*

In line with the Court's directive, the Board has proposed a K–4 Intervention/Remediation Program, which will be directed toward those schools or classes

---

would have an enrollment of 404, with a capacity of 906, Pearl would have an enrollment of 852, with a capacity of 1295, and Cohn would have an enrollment of 744, with a capacity of 1136.

14. In addition to those set forth in the text, see the remaining pairings on the map, Exhibit 266:

| | |
|---|---|
| Wright | — Glencliff, Early, Brookmeade |
| Meigs | — Warner, Glengarry, Hickman, Haywood |
| Apollo | — Una, Kirkpatrick, Fall-Hamilton |
| Rose Park | — Carter-Lawrence, Berry, Lakeview |

15. Pearl.

where the achievement levels are below the average for the system and/or where the majority of a school's population is made up largely of socio-economically deprived children who suffer the continuing effects of prior discrimination. The cornerstone of this proposal is the transition class whereby students who meet the Court's criteria and who are unable to perform at grade level in the normal classroom setting will be placed in a transition class at the end of kindergarten and/or first grade. The students will stay in these half-step classes for one semester or the entire year, depending upon their needs. Here, pursuant to the Court's directive, adult-student ratios will be lowered, and the cost borne in part by decreased transportation costs associated with the K–4 schools having a neighborhood character.[16] Ms. Lucille Nabors, Assistant Superintendent for Program and Staff Development, testified at length about these programs, and stated that they were ready for implementation in those elementary schools included in the approved interim plan, discussed *infra*. Other remediation programs planned by the staff include basic development curriculum in math, language arts, and reading. (Exhibits 277, 278, part 1, pp. D–1—D–4, and part 2).

The Plaintiffs filed only two objections relating to the intervention/remediation program. Specifically, plaintiffs argued that the program should not be limited to grades K–4, and that it should not be paid for with Title I funds. (Objection 1(d), March 25, 1981, and Objection 1(e), March 25, 1981). From the exhibits and from the testimony of Ms. Nabors, it is apparent that remediation efforts in the system are currently directed toward all grades. (See Exhibit 278, part 1, at D–1). However, the

Court's Order was directed only to remediation in grades K–4, in order to maintain the delicate balance set forth in that Order.[17] Moreover, inherent in the Court's Order is the recognition that when remediation is effective in the lower grades, there should be less need for it in the upper grades.

Plaintiffs' objection regarding Title I funds is also not well taken. Ms. Lucille Nabors testified that the Defendants are cognizant of the Title I Regulations and statutes, which at this time appear to preclude the use of Title I funds for educational components of court-ordered desegregation plans. The plans proposed by the Board for implementation under the Court's Order will be funded fully with state and local funds. In fact, those students the Plaintiffs would wish to receive remedial services will be receiving twice the amount of such services, from the local level and from the federal level.

The Court's Order of May 20, 1980, directed the Board to plan intercultural experiences for students in those schools which, because of the Court's cost-benefit analysis, would attend predominately one race schools. Based upon the testimony of Ms. Nabors, and the voluminous exhibits presented, the Court is satisfied that the Board has met this criteria, and has used its initiative to develop intensive programs which the professional staff deem valid and educationally sound.

Dr. Hugh Scott, the Plaintiffs' expert witness, testified at length about the trend toward and the need for multicultural education directed toward the recognition of cultural diversity in a pluralistic society. The multicultural committees have devel-

---

**16.** In the Board's pleading accompanying their plan is the notation that on January 13, 1981, the Board of Education adopted a resolution made by Mr. George Cate and seconded by Mrs. Barbara Mann regarding funding of the educational components. This motion reads as follows: "I move that the Board adopt as a policy that to the extent that money is saved in 1981 and later years in transportation by adoption of the K–4 neighborhood plan, that such funds be applied to the educational component of the plan with priority to the K–4 intervention-remediation program, and that the

staff be directed to follow that policy and consider the specific guidelines set down by the Court in its opinion as budgets for the ensuing years are prepared and submitted to the Board."

**17.** The neighborhood character of the K–4 schools will permit increased parental involvement in every school, a concept espoused by Dr. Hugh Scott and capitalized upon by the Board's proposal to provide parental training to increase support for target children. (Exhibit 278, part 1, at D–3—D–4).

oped a detailed program along the lines of Dr. Scott's suggestion. This program will eventually be offered in every school, grades K–12. (Exhibit 278, part 1, A–4). A curriculum guide for grades K–6 has already been developed and will be ready for use in those grades in 1981–1982 (Exhibit 276). Ms. Nabors testified that a similar guide for grades 7–12 is to be developed in the near future.

An intercultural exchange program is also planned pursuant to the Court's directive for those K–4 schools that will be predominately one race. These programs must, of necessity, be tailored to the individual schools and staffs involved, and these programs will be operational in the predominately one race schools under the interim plan in 1981–1982.

The Plaintiffs filed only one objection with regard to the multicultural-intercultural exchange program proposed by the Board, which objection was not specific in nature. Objection 1(a) (March 25, 1981) indicates that the Plaintiffs accept the goals and objectives of the multicultural program, but insist that sufficient detail was not supplied. The testimony of Ms. Nabors and exhibits previously mentioned satisfy the Court that the validity of the planned programs has been shown and that the programs are in full compliance with the Court's directives of May 20, 1980.

The magnet school proposal presented by the Board did not satisfy the Court's desire to have at least one such alternative program [18] implemented immediately. The delay was not based upon lack of curriculum development, since plans for an academic magnet school were well under way at the time this Court approved the Board's timetable for implementation of the plan on July 15, 1980. The Board felt the program should be delayed until a suitable building for such a 7–12 grade school could become available. This problem has been obviated by the adoption of the modified interim pupil assignment plan, discussed *infra*. The Court questioned Ms. Nabors at length

about the time necessary to implement the planned academic magnet school for 1981–1982 in the event a suitable building could be found. While Ms. Nabors and her committees understandably felt that more time than is available between now and the beginning of school in the fall of 1981 would be preferable for the selection of staff and students, she did testify that the task could be completed. Based on that representation, and the desire of this Court to minimize the delay in implementing as much of this plan as possible, the Court now orders that the proposed academic magnet school, to be located at the present West End Junior High School, be implemented for the coming school year, beginning with grades 7 and 8, and adding a grade each year thereafter.

The Plaintiffs only objection to the magnet school proposal outlined by the Board is directed toward the student selection procedure to be employed for such school. While the Board did not intend to use its selection procedure for the coming year, the Court is impressed by the mechanism developed for such selection (Exhibit 274), which includes achievement test scores, teacher ratings, and school records. These criteria will insure sufficient flexibility to provide equal access to all races, contrary to the Plaintiffs' objection. This objection is accordingly overruled.

The Black History or Afro-American Studies Program ordered by the Court in its Order of May 20, 1980, is presently in operation, having been offered in the high schools for the first time in the fall of 1980. The Court finds the curriculum guide for this course to be most adequate. (Exhibit 275). This course, along with continuing efforts to include such studies in the regular curriculum and to screen curriculum and textbooks for sensitivity to the heritage of black Americans, and the multicultural program for all grades discussed previously, complies with this Court's directive. The Plaintiffs' objection relating to the lack of specificity and to general curriculum con-

---

18. The Board's plan proposed to continue the operation of Hume Fogg High School as an open zoned school with grades 9–12 for the school year 1981–1982. This proposal includes the Board's intention to re-evaluate the continuation of Hume Fogg on an annual basis. This proposal is approved.

siderations is overruled. (Objection 1(c), March 25, 1981).

The educational considerations inherent in the move toward middle schools pursuant to the Court's directive were addressed extensively by Ms. Nabors and set forth in the exhibits. (Exhibit 278, part 1, Section E). The implementation of the middle school philosophy with its emphasis on bridging the gap between elementary and high school should go a long way toward meeting this Court's directive to concentrate on quality education and to increase community perceptions thereof.[19]

The final educational component ordered by the Court concerns in-service training of faculty and staff members for successful implementation of the plan. No pertinent objection has been filed by the Plaintiffs to this component.[20] From the testimony and the materials presented, this component is well developed, providing a continuation of the on-going "Together We Can ... Together We Will" program previously lauded by this Court, and for new programs related to the desegregation order. (Exhibit 278, part 1, pages G–1—H–30). It is, therefore, approved as complying with the Court's Order of May 20, 1980.

In view of the foregoing discussion and findings, the educational component package as presented by the Board, with the modification regarding the academic magnet school beginning with grades 7–8 in 1981–1982, is approved as complying with this Court's Order of May 20, 1980.

## II. *PUPIL ASSIGNMENT COMPONENT*

Two proposals were made by the Board for pupil assignment, the long range plan for implementation in 1984, and the interim plan for implementation in 1981–1982. As detailed, *infra*, the long range plan is ap-

proved as in conformity with the Court's Order of May 20, 1981; the interim plan is modified to include an expanded zone of implementation for 1981–1982.

### A. *The Long Range Plan.*

The Board's long range proposal for elementary schools, Exhibits 268 and 271, fully complies with the Court's directive to establish a system of K–4 or K–5 elementary schools of a neighborhood character, all the while maximizing opportunities for integration in a neighborhood setting. Of the 75 K–4 elementary schools proposed, Mr. Osborne estimates that approximately 31 of these schools will be walk-in schools requiring no transportation, as compared to only five at the present time. This should permit increased parental participation deemed so important by this Court and by the Plaintiffs' own expert witness, Dr. Hugh Scott.

In drawing the school zone lines for elementary schools, Mr. Osborne and his bi-racial committee committed themselves to maximizing integration as much as possible without the use of non-contiguous zones, and the results were surprising. No K–4 school is projected to be 100% black, and only five schools in the outer reaches of the County are projected to be 100% white.[21] It should be noted here that while the Plaintiffs' plan was stricken from the record, it contained a proposal to leave some of these distant outlying schools untouched by the Plaintiffs' own desegregation plan. (*See*, Plaintiffs' Exhibit Number 284 for Identification).

Approximately 20 of the elementary schools are projected to be within the 15% black or white ratio established by the Court for middle schools. Those schools which fall outside this percentage will benefit from the intercultural exchange program discussed above.

19. No objections were filed by the Plaintiffs relating to the educational component for middle schools.

20. The Plaintiffs' only objection to the administrative and staff development portion of the plan relates not to the in-service educational component, but to affirmative action plans for staff and administrative positions. While this

was part of the Court's Order of May 20, 1980, the Court has reserved the personnel issue for a later date, and accordingly, no proof has been presented by the Board regarding its affirmative action plans.

21. Gateway, Hickman, Joelton, Sylvan Park, and Union Hill. (Exhibit 268).

The Court is satisfied that the elementary school plan meets the Court's Order of May 20, 1980, and all the Plaintiffs' objections relating to it have no bearing on the question of compliance with the Court's mandate.[22]

The middle school plan approved by the Board contemplates the creation of 24 middle schools serving grades 5–8 in 1984. (Exhibits 268 and 269). According to the testimony of Mr. Osborne, the Board began its consideration of the middle school plan by locating suitable buildings for the unique middle school program, as outlined by the Middle School Educational Component Committee.

After the schools were selected, zones were constructed to comply with the Court's mandate to achieve at minimum a 15% representation of either race in the middle schools. Under the Board's proposal, four middle schools are not projected to fall within this 15% black/white range in 1981: Donelson (14.8% black), Apollo (14.1% black), Antioch (14.0% black), and Wright (11.7% black). These schools may well fall within the 15% range by 1984, and to require their technical compliance with the suggested ratio at this time would necessitate the rezoning of black children from neighborhood middle schools into these middle schools. In drawing the middle school zones, the Board used non-contiguous zones only where necessary, and as demonstrated by Mr. Osborne, chose the closest other-race population to constitute the non-contiguous zones wherever practical.

Plaintiffs only objection to the Board's middle school proposal is that the burden of transportation continues to be on the black children. The middle school map (Exhibit 269), and the testimony of Mr. Osborne, demonstrate conclusively that this is not the case. In many instances, white children are required to travel to predominately black communities to attend school. For exam-ple, white children in the outer reaches of the County are required to travel to the predominately black innercity to attend Cameron; white students from the southern portion of the Pearl zone are required to travel into the innercity to Pearl; white students are required to travel into Ewing Park; and white students are required to travel into Cumberland. Merely because there may be more non-contiguous zones made up of predominately black children does not mean that these students must travel longer distances or greater lengths of time than white children, nor does it mean that these students must necessarily travel out of their neighborhoods more often than white children. The Court finds that the locations of the middle schools were chosen by a neutral process, in an effort by the Board to accommodate the unique middle school program at the best possible places, thereby looking forward to the enhancement of quality education. The amount of transportation involved for either race is necessary to reach the 15% representation level deemed desirable by the Plaintiffs' expert witness, Dr. Hugh Scott and approved by the Court in its Order of May 20, 1980.

In addition, Plaintiffs' objection regarding burden on black students at the middle school level constitutes not an objection, but an admission that the Plaintiffs' proposed plan does not comply with the Court's Order. Plaintiffs used the same middle schools in their proposed plan that the Board has used under its plan. (Exhibit 283). It is inconceivable that their objections regarding burden on black children can be alleviated by their plan because there are no additional middle schools in the black community. When this obvious concept is coupled with the racial balance approach used by the Plaintiffs, which will require transportation of greater numbers of black children out of the black community, it is apparent that the burden on black students is increased in the Plaintiffs' plan

---

22. Plaintiffs' Objection (3)(a) (February 6, 1981) and Objection 2 (March 25, 1981) attack the neighborhood character of the elementary school proposal. Again, this constitutes an attack on the Court's Order rather than an effort to achieve compliance with it. Accordingly, these objections are stricken under Rule 12(f), Federal Rules of Civil Procedure, along with the Plaintiffs' elementary school plan.

contrary to the basic concepts of the Court's Order.

The Board's high school plan (Exhibits 267 and 268) is also in total compliance with the Court's directive of May 20, 1980. Bellevue and Joelton were closed as high schools in the school year 1980–1981, with the high school population of these schools being reassigned to Hillwood and Whites Creek pursuant to the Court's directive. The long range proposal for 1984 forecasts the closure of Antioch, DuPont, Pearl, Cohn, and Goodlettsville as high schools, with their school populations being accommodated by the Goodlettsville-Madison, Pearl-Cohn, McGavock, Glencliff and Overton zones ordered by the Court.

The only deviation from the plan contemplated by the Court and the Board's new plan concerns Goodlettsville-Madison. Since the early 1970's, the Board has proposed to build a new Goodlettsville-Madison-Trinity Hills Comprehensive High School at the Hunter's Lane location. Upon reconsideration of this proposal following the Court's Order, the Board determined that it would be more economically responsible to expand the existing Madison High School to accommodate students from the Goodlettsville, Madison, Trinity Hills, and DuPont areas at a savings in excess of $2,000,000.00. (Board Minutes, Exhibit 286). The testimony of Mr. Osborne indicates that the locations make little difference to the student populations involved. If anything, the Madison location is slightly closer to the highest concentration of black students for the school population in the Trinity Hills area than was the Hunter's Lane location and the racial makeup of the school is not affected by a change in location.

The Ford Greene site chosen for the Pearl-Cohn Comprehensive High School is also approved as a central location in the proposed zone, taking into account the relative concentration of students in that zone.

It should be noted here that while the Court did not decree the racial mixture in the high schools as it did in the middle schools, all of the Board's proposed high schools, with the possible exception of Goodlettsville-Madison at 14.9% black, fall well within the 15% either race guideline established by the Court for middle schools. Furthermore, three of the 10 schools are projected to be majority black in 1984.[23]

The Plaintiffs only objections to the high school plan concern the Board's failure to consider the pairing of Maplewood and Goodlettsville in lieu of building the Goodlettsville-Madison Comprehensive High School, and its failure to use Pearl as a high school. (Objection 3(b) (February 6, 1981), and Objection 2(b) (March 25, 1981)). Both of these objections are without merit. The Maplewood objection attacks rather than follows the Court's Order of May 20, 1980, and accordingly, it should not be considered. The soundness of the Board's action in converting Pearl to a middle school is supported by the fact that the Plaintiffs' plan also uses Pearl as a middle school, rather than a high school. (Exhibit 283).

In view of this discussion, the Board's long range pupil assignment plan is approved in its entirety as in compliance with the Court's Order of May 20, 1981.

### B. The Interim Plan.

The Board's interim plan for implementation in the fall of 1981 proposes to implement the Court's Order of May 20, 1980, in only one area of the county—the area encompassed by the Whites Creek Comprehensive High School zone (Map, Exhibit 272, and statistical summary, Exhibit 272). Insofar as this plan goes, this portion of the interim plan is approved, including the minor deviations from the long range plan requiring the phasing in of certain zones over the next three years.[24]

---

**23.** Maplewood, Pearl-Cohn, Whites Creek.

**24.** As Mr. Osborne testified, the Whites Creek zone, as shown on the 1984 long range map, can be implemented in 1981, with a few minor exceptions. These exceptions relate to building capacity. Whites Creek can accommodate the Union Hill zone (now in Goodlettsville), the Brick Church zone (now in Maplewood), and the Haynes Manor area (now in Maplewood) in 1984, because of projected declines in enrollment. However, during the interim, only one

In 1981, implementation of the plan in the northeastern section of the County will involve eight elementary schools serving grades K–4, three middle schools serving grades 5–8, and one comprehensive high school.

At the time this plan was filed, the Court was concerned that more of the County could not benefit from the early implementation of the three-tiered grade structure from intervention/remediation and from the magnet school proposal until 1984. Accordingly, on March 31, 1981, the Court directed the Board to present further alternatives for increased implementation of the plan on April 6, 1981.

In directing the Board to consider other alternatives for implementation of the plan, the Court was not attacking the Board's good faith efforts in deciding not to implement the plan further. As was stated by Mr. Osborne, the rationale behind the slow implementation was that until the two new comprehensive high schools were built, any rezoning of students could be made on a temporary basis only. To avoid temporary disruption of students on this basis, the Board decided to make such changes only where permanent assignments could be made, and this could only be accomplished in the Whites Creek zone. While understanding this rationale, this Court deems the benefits to be achieved by the earlier implementation of the plan to far outweigh the minor disruptions occasioned by a stepped-up timetable.

After the Court's directive to the Board to develop an alternative proposal, the Board reported to the Court a proposal to implement the new plan insofar as possible in the southeast sector of the city in addition to the northeast sector.[25] This proposal would involve the rezoning of Cohn and Pearl High School students to Hillsboro and Hillwood for the interim period beginning 1981–1982, pending the completion of the Pearl-Cohn Comprehensive High School in 1984. This move would free Pearl and Cohn for immediate use as middle schools, pursuant to the Board's plan, and would also free West End for immediate use as an academic magnet school in 1981–1982. Elementary school zones for this interim plan have not yet been finalized, and some flexibility will be necessary, especially on the outer fringes of the southeast sector. This Court is assured that this planning can be completed well in advance of the approaching school year, and that the appropriate educational components can be in place for this sector just as they will be in place in the northeastern sector. Accordingly, the revised interim plan is approved.

It should be noted here that to complete the plan in the remaining sections of the County will require the construction of the Goodlettsville-Madison Comprehensive High School and a sufficient decline in enrollments at Glencliff, McGavock, and Overton, thus permitting the reassigning of students from Antioch High School and DuPont pursuant to the Court's directive. Accordingly, pending such events, attendance patterns in this section of the County should remain as they are.

grade a year from those areas can be added to Whites Creek. Therefore, beginning with the ninth grade in 1981, adding the tenth grade in 1982, and so on, the interim plan proposes to stagger the implementation of the long range plan in this area. The procedure will not only direct itself toward building capacity, it will also facilitate as little disruption of students as possible, since students who begin the ninth grade at Maplewood and Goodlettsville in 1980–1981 will be permitted to graduate from those schools.

The zones for the three middle schools, Joelton, Ewing Park, and Cumberland, will be implemented in 1981, with the exception that chil- dren in the Parkwood Estates area will continue to attend Ewing Park until 1984, when they are scheduled to attend Goodlettsville, and students from the Haynes area will continue to attend Meigs and Highland Heights until 1984, when they are scheduled to attend Ewing Park. These deviations are necessary because of capacity problems that will be alleviated in 1984 by virtue of the construction of a new high school to serve the Goodlettsville-Madison-Trinity Hills-DuPont area.

25. This proposal was attached to the interim plan map in the form of an overlay on Exhibit 272 and is described on Exhibit 279.

ADDITIONAL MATTERS

After many days of testimony in this cause, it has become apparent to this Court that the rigid guidelines placed upon the school system by this Court's Order in 1971 have become obsolete and no longer necessary. The good faith efforts of this Board to achieve desegregation have been amply demonstrated by all the plans submitted to this Court. This Court does not deem it necessary to impose further rigid guidelines upon the Board in terms of minor alterations in zone lines where deemed advisable to achieve better integration or to conform to building capacities. In addition, in view of the new plan now approved, the restriction placed upon building in the outlying areas by the 1971 Order no longer has validity, since the new plan addresses desegregation and quality education on a county-wide basis. Accordingly, the ban on such construction, where deemed necessary by the Board to improve facilities, accommodate students, or enhance integration, should be lifted.

An appropriate Order will enter. This is a final order from which an appeal as of right is provided by Rules 3 and 4, Fed. Rules App.Proc. Because efforts at implementation for the school year 1981–82 are immediately imperative, this Court will not grant a stay of this order pending any appeal.