Robert W. KELLEY, et al.,
Plaintiffs-Appellants,

v.

METROPOLITAN COUNTY BOARD OF
EDUCATION OF NASHVILLE AND
DAVIDSON COUNTY, TENNESSEE,
Defendants-Appellees.

No. 81–5370.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 11, 1981.

Decided July 27, 1982.

Certiorari Denied Jan. 24, 1983.
See 103 S.Ct. 834.

Avon N. Williams, Jr., Richard H. Din-
kins, Nashville, Tenn., Jack Greenberg,
James M. Nabrit, III, Bill Lann Lee, New
York City, for plaintiffs-appellants.

William R. Willis, Jr., Marion F. Harri-
son, Nashville, Tenn., for defendants-appel-
lees.

Before EDWARDS, Chief Judge, JONES,
Circuit Judge and CELEBREZZE, Senior
Circuit Judge.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

This much delayed school desegregation case is before this court for review of a desegregation plan approved by the District Court.[1] It offers no new legal issues and can and must be decided by this court on the basis of final decisions of the United States Supreme Court. *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II) requires our affirmance of the District Court on several issues. The cases that require our reversal of two issues decided by the lower court are legion. Leading the list are *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Keyes·v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Penick v. Columbus Board of Education*, 583 F.2d 787 (6th Cir. 1978), *aff'd*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Reed v. Rhodes*, 607 F.2d 714 (6th Cir. 1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980); and last but not least, *Kelley v. Metropolitan Board of Education*, 463 F.2d 732 (6th Cir.), *cert. denied*, 409 U.S. 1001, 93 S.Ct. 322, 34 L.Ed.2d 262 (1972).

It should be noted at the outset that this case is markedly distinguished in legal terms from those that have come before this and other courts from states where segregation by law has never existed or was long ago statutorily abandoned. In those cases, the federal courts have been primarily concerned with the question of whether or not predominantly black and predominantly white schools existed as a result of intentional segregative practices on the part of the school boards concerned. *See Reed v. Rhodes, supra; Penick v. Columbus Board of Education, supra; Brinkman v. Gilligan*, 583 F.2d 243 (6th Cir. 1978), *aff'd sub nom., Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (Dayton II). No such inquiry is necessary in this case; Tennessee's history of *de jure* segregation is well-established.

In 1955, when litigation aimed at desegregating the Nashville schools began, racial segregation was constitutionally and statutorily mandated in Tennessee, and the School Board was in full compliance with those provisions. Article 11 § 12 of the state constitution proclaimed: "No school established or aided under this section shall allow white and negro children to be received as scholars together in the same school," and statutes consistent with this provision were enacted. *See* T.C.A. §§ 49–3701 *et seq.* In 1956, the Tennessee Supreme Court struck down the statutes requiring compulsory separation of races, *Roy v. Brittain*, 201 Tenn. 140, 297 S.W.2d 72 (1956), and in 1959 this court invalidated a new law allowing local school boards to provide white, black and mixed schools, with attendance to be determined by parental choice. *Kelley v. Board of Education*, 270 F.2d 209 (6th Cir.), *cert. denied*, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240 (1959). The statutes thereafter were omitted from the revised statutory compilation, with the compiler's note stating the statutes had been omitted because they were unconstitutional, citing to the above-named cases. In 1970, the Tennessee Legislature did pass a law mandating the public schools would be open to persons of all races, *see* Tenn.Code Ann. § 49–1770 (1977). But it was not until 1978 that Tennessee's constitution was amended to delete the requirement of separate schools. Finally, effective March 15, 1979, more than twenty years after the laws were declared unconstitutional, the Tennessee Legislature repealed the old school segregation statutes.

It therefore is clear that when the first "comprehensive and potentially effective desegregation order"[2] was entered in this case in 1971, the existing racial separation in the Nashville schools had resulted from

---

1. *Kelley v. Metropolitan County Board of Education*, 511 F.Supp. 1363 (M.D.Tenn.1981).

2. 463 F.2d at 734.

*de jure* segregation. And despite the 1971 plan's potential, the record establishes and the District Court found that desegregation in the Nashville schools has never been achieved. Thus the effects of state-imposed segregation have yet to be eradicated.

It was the School Board's implementation of the 1971 plan that prevented effective desegregation, according to the District Court. In *Kelley v. Metropolitan Board of Education,* 463 F.2d 732 (6th Cir.), *cert. denied,* 409 U.S. 1001, 93 S.Ct. 322, 34 L.Ed.2d 262 (1972), this court approved the 1971 HEW-drafted desegregation remedy, which was based on *Swann v. Charlotte-Mecklenburg, supra,* and which attempted to achieve desegregation through zoning. After the plan had been in effect for one year, the Board petitioned for changes, claiming hardships had arisen from the plan. The District Court emphatically rejected the petition, finding the Board had not acted in good faith in implementing the desegregation remedy. Thereafter, the Board submitted proposals for construction and for a kindergarten program using portables, which both were opposed by plaintiffs as inconsistent with the approved plan. Plaintiffs later petitioned that the Board be held in contempt for its unsanctioned implementation of the proposals. In 1978 the Board petitioned to amend school attendance zones; plaintiffs then amended their contempt petition.

In 1979, the District Court began hearings on all pending matters concerning the school system.[3] From the proof presented, the District Court found the Nashville-Davidson County school system had become increasingly segregated in the years since 1971. The original remedy had not extended throughout the county, and whites had been able to avoid the plan by fleeing to the outer reaches, leaving the inner city schools with a high black population. After reviewing the evidence, the District Court stated, "[t]he resegregation, resulting, at least in part, from the nonetheless good

faith efforts of the School Board in the implementation of the Court's order, amounts to a *de jure* segregation." *Kelley v. Metropolitan County Board of Education,* 479 F.Supp. 120, 123 (M.D.Tenn.1979). This "resegregation" was exacerbated by the Board's institution of an optional transfer policy that violated the spirit of the 1971 order and emasculated desegregation efforts, according to the District Court.

Judge Wiseman's determination that desegregation has never been achieved in the Nashville-Davidson County school system is amply supported by the record, and that finding, therefore, is affirmed. Thus the School Board remains under its duty "to eliminate from the public schools all vestiges of state-imposed segregation." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971).

## EDUCATIONAL COMPONENTS

As a result of the 1979 hearings, the District Court ordered the Board to formulate a new desegregation plan "assuming no parameters heretofore ordered by the Court, but with the primary objective of the achievement of a unitary school system for the entirety of Davidson County." 479 F.Supp. at 122. After several proposals and in accordance with specific instructions from the District Court, *see Kelley v. Metropolitan County Board of Education,* 492 F.Supp. 167 (M.D.Tenn.1980), the Board drafted a plan that gained the District Court's approval. *Kelley v. Metropolitan County Board of Education,* 511 F.Supp. 1363 (M.D.Tenn.1981). It is plaintiffs' appeal from this order that is before us.

We affirm certain aspects of this plan. With regard to the District Judge's orders concerning education components, we approve the remediation program planned by the Board of Education's staff for "those schools or classes where the achievement

---

**3.** Several of the issues pending before the District Court when hearings were resumed in 1979 still have not been heard. These pending matters include allegations of discriminatory

faculty and staff assignments, charges that the defendants are in contempt of court, and motions for attorneys' fees.

levels are below the average for the system and/or where the majority of a school's population is made up largely of socio-economically deprived children who suffer the continuing effects of prior discrimination." 511 F.Supp. at 1368–69. Our affirmance of this issue does not depend upon the outcome of any other issue in this case, nor does it depend upon whether or not Title I federal funds are available. *See Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977).

Likewise, this court affirms the District Judge's order for the use of West End Junior High School as a magnet school, with selection criteria designed to provide equal access to all races. Further, we affirm the District Court's approval of the already launched Afro-American studies program. While we note plaintiffs' objections to lack of specificity of such programs, we believe this is a matter that can be handled by the District Court and the School Board without intervention by the appellate court. Finally, we affirm the District Judge's approval of the "Together We Can ... Together We Will" program.

## PUPIL ASSIGNMENT COMPONENT— MIDDLE SCHOOLS AND HIGH SCHOOLS

In large measure, the pupil assignment components of this plan do not withstand constitutional scrutiny. In fashioning its school desegregation plan, the Board was directed by the District Court to bring about a 15% minimum presence of either race in each middle school (grades 5–8), and application of this standard to the high schools as well was accepted by the lower court. The District Court's choice of 15% either race minimum presence as a desegregation standard would find acceptable schools that are either 85% white or 85% black. This figure is clearly not appropriate as a "starting point" in a school system that has a 68% white-32% black racial composition.[4]

In *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 23–25, 91 S.Ct. 1267, 1279–1280, 28 L.Ed.2d 554 (1971), Chief Justice Burger wrote for a unanimous Supreme Court as follows:

In this case it is urged that the District Court has imposed a racial balance requirement of 71%–29% on individual schools. The fact that no such objective was actually achieved—and would appear to be impossible—tends to blunt that claim, yet in the opinion and order of the District Court of December 1, 1969, we find that court directing

"that efforts should be made to reach a 71–29 ratio in the various schools so that there will be no basis for contending that one school is racially different from the others .... [t]hat no school [should] be operated with an all-black or predominantly black student body, [and] [t]hat pupils of all grades [should] be assigned in such a way that as nearly as practicable the various schools at various grade levels have about the same proportion of black and white students."

The District Judge went on to acknowledge that variation "from that norm may be unavoidable." This contains intimations that the "norm" is a fixed mathematical racial balance reflecting the pupil constituency of the system. If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.

As the voluminous record in this case shows, the predicate for the District Court's use of the 71%–29% ratio was twofold: first, its express finding, ap-

---

**4.** At the middle school level, seven of the 24 schools are projected as majority black, and fully one-half would fall outside of a 15% plus or minus deviation from the 32% minority presence in the school system.

proved by the Court of Appeals and not challenged here, that a dual school system had been maintained by the school authorities at least until 1969; second, its finding, also approved by the Court of Appeals, that the school board had totally defaulted in its acknowledged duty to come forward with an acceptable plan of its own, notwithstanding the patient efforts of the District Judge who, on at least three occasions, urged the board to submit plans.[8] As the statement of facts shows, these findings are abundantly supported by the record. It was because of this total failure of the school board that the District Court was obliged to turn to other qualified sources, and Dr. Finger was designated to assist the District Court to do what the board should have done.

We see therefore that the use made of mathematical ratios was no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement. From that starting point the District Court proceeded to frame a decree that was within its discretionary powers, as an equitable remedy for the particular circumstances. As we said in *Green*, a school authority's remedial plan or a district court's remedial decree is to be judged by its effectiveness. Awareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violations. In sum, the very limited use made of mathematical ratios was within the equitable remedial discretion of the District Court.

[8] The final board plan left 10 schools 86% to 100% Negro and yet categorically rejected the techniques of pairing and clustering as part of the desegregation effort. As discussed below, the Charlotte board was under an obligation to exercise every reasonable effort to remedy the violation, once it was identified, and the suggested techniques are permissible remedial devices. Additionally, as noted by the District Court and Court of Appeals, the board plan did not assign white students to any school unless the student population of that school was at least 60% white. This was an arbitrary limitation negating reasonable remedial steps.

(footnotes 7 and 9 omitted).

As mentioned earlier, this record shows the black-white pupil ratio in the Nashville-

Davidson County school system to be 68% white and 32% black. It is that ratio the District Court should have employed as the "starting point" in the remedy-fashioning process.

The District Judge selected the admittedly arbitrary 15% either race figure because "it seem[ed] to represent a reasonable attempt to provide intercultural and interracial contact as a foundation for social harmony." 492 F.Supp. at 193. This selection, and such other errors as we find in the District Court's opinions and orders, originate with his apparent conclusion that the unanimous opinion of the Supreme Court in *Swann* has somehow been overruled or eroded. But the disposition of cases originating in this and other circuits does not support any such conclusion. In fact, *Swann* was strongly reaffirmed by the Supreme Court's approval of this court's opinion in *Penick v. Columbus Board of Education*, 583 F.2d 787 (6th Cir. 1978), *aff'd*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). The *Swann* opinion is the law of the land. And this court, the District Court for the Middle District of Tennessee, and the School Board of Nashville and Davidson County are required by our constitutional form of government to follow its standards. In accordance with those standards, the District Judge will be required on remand of this case to determine the currently prevailing racial population of the school system concerned and to employ that ratio as a "useful starting point in shaping a remedy to correct past constitutional violations."

We approve all other aspects of the middle school and high school plans, recognizing, of course, that rejection of the 15% either race minimum presence as a desegregation standard will necessarily involve significant redrafting and restructuring. Whenever the *Swann* discussion set out above requires revision of these school plans, such revisions must be made. We note our awareness that this instruction encompasses *Swann's* recognition that there is no constitutional right to any "particular

degree of racial balance." But we also recognize that predominantly one-race schools deserve "close scrutiny" and that the duty on the Board and courts to dismantle a dual system is clear:

The district judge or school authorities should make every effort to achieve the *greatest possible degree of actual desegregation* and will thus necessarily be concerned with the elimination of one-race schools. No *per se* rule can adequately embrace all the difficulties of reconciling the competing interests involved; but *in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition.* Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court

that their racial composition is not the result of present or past discriminatory action on their part.

*Swann, supra* 402 U.S. at 26, 91 S.Ct. at 1281 (emphasis added).

In line with this duty, we suggest the formula employed by this court in the *Columbus* case, *i.e.,* use of a 15% plus or minus deviation from the 68–32% white-black ratio for all students in the school system.[5]

### PUPIL ASSIGNMENT COMPONENT—GRADES K–4

■ The District Court directed the Board "to establish a system of K–4 or K–5 [kindergarten through fourth or fifth grade] elementary schools of a neighborhood character, all the while maximizing opportunities for integration in a neighborhood setting."[6] The Board complied, and this plan was approved by the District Court. This was fundamental error, unconstitutional under *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct.

---

**5.** An essential element of the plan on remand thus will include "reassigning students to achieve the greatest possible number of desegregated schools." *See Liddell v. Board of Education of City of St. Louis,* 667 F.2d 643 (8th Cir. 1981). We reemphasize that we are not requiring any *precise* degree of racial mixing, but we are requiring the District Court to use all feasible methods of pupil assignment to achieve the maximum amount of integration possible.

A directive to employ a racial balancing approach clearly is anything but novel. For example, this court in *Northcross v. Board of Education of Memphis City Schools,* 466 F.2d 890 (6th Cir. 1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1355, 35 L.Ed.2d 586 (1973), approved the District Judge's view that *Swann* required more "intensified desegregation efforts" for Memphis than a neutral geographic zone assignment plan and his concomitant order of busing to achieve racial balance. We stated:

It is thus clear that far from having achieved a unitary school system, the Board has helped to perpetuate the old dual system. Under these circumstances *there can be no doubt that the District Court was under an obligation to order the adoption of a plan*

*providing for further desegregation.* Since many of the one-race schools are clearly the result of discriminatory actions of the School Board *there can be no doubt that under any interpretation of Swann the elimination of such schools must be one of the objectives of any appropriate desegregation plan. Id.* at 893–94 (emphasis added).

It is beyond dispute that Nashville has never achieved unitary status, in large part because of the Board's implementation of the 1971 plan. We do not believe the District Court and Board fulfilled their duties to eliminate one-race schools by accepting as desegregated 85% black and 85% white schools.

We recognize our directive to the District Court in this case is quite specific. Our specificity, however, is made necessary by our view that "a plan that at this late date fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is . . . intolerable." *Green v. County School Board,* 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968).

**6.** 511 F.Supp. at 1371.

1267, 28 L.Ed.2d 554 (1971); *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979), and *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979). All of these cases have held or implied that the constitutional barrier to racially segregated schools applies to *all* schools in the system, including the early grades.

In this case, the District Judge's order would serve to resegregate or to maintain segregation in grades K–4. Forty-seven of the 75 elementary schools would be more than 90% one race, with 14 schools projected as more than three-fourths black.

The District Judge based his directive on the perceived benefits of a neighborhood school system for elementary students, noting the desirability of parent-teacher contact, reduced pupil-teacher ratios, and other "educational" advantages.[7] In *Swann*, Chief Justice Burger considered pro-neighborhood arguments, presumably similar to those influencing the District Judge in this case, and found them wanting:

> Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial

segregation. The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems.

> No fixed or even substantially fixed guidelines can be established as to how far a court can go, but it must be recognized that there are limits. The objective is to dismantle the dual school system. "Racially neutral" assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court with a "loaded game board," affirmative action in the form of remedial altering of attendance zones is proper to achieve truly nondiscriminatory assignments. In short, an assignment plan is not acceptable simply because it appears to be neutral.

402 U.S. at 28, 91 S.Ct. at 1280.

It is thus clear from *Swann* that no matter whether neighborhood schools may be desirable on some grounds, their advantages cannot outweigh the constitutional requirement to desegregate the schools.[8]

---

**7.** The importance of desegregated schools, however, particularly for minority students, was recently emphasized by the Supreme Court:

Education has come to be "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown v. Board of Education*, 347 U.S. 483, 493 [74 S.Ct. 686, 691, 98 L.Ed. 873] (1954). When that environment is largely shaped by members of different racial and cultural groups, minority children can achieve their full measure of success only if they learn to function in—and are fully accepted by—the larger community. Attending an ethnically diverse school may help accomplish this goal by preparing mi-

nority children "for citizenship in our pluralistic society," *Estes v. Metropolitan Branches of the Dallas NAACP*, 444 U.S. 437, 451 [100 S.Ct. 716, 723, 62 L.Ed.2d 626] (1980) (POWELL, J., dissenting).
*Washington v. Seattle School District*, ⸺ U.S. ⸺, ⸺, 102 S.Ct. 3187, 3196, 73 L.Ed.2d 896 (1982).

**8.** In the Supreme Court's latest consideration of the neighborhood school concept, the majority struck down a statewide initiative adopted by the voters of the state of Washington that would have required limiting school attendance to those students residing in the neighborhood of the school concerned. While the majority decision was joined by five Justices, the four dissenters emphasized that they disagreed be-

The unanimous *Swann* opinion also dealt squarely with the issue of busing, another concern of the District Judge in this case:

(4) *Transportation of Students.*

The scope of permissible transportation of students as an implement of a remedial decree has never been defined by this Court and by the very nature of the problem it cannot be defined with precision. No rigid guidelines as to student transportation can be given for application to the infinite variety of problems presented in thousands of situations. Bus transportation has been an integral part of the public education system for years, and was perhaps the single most important factor in the transition from the one-room schoolhouse to the consolidated school. Eighteen million of the Nation's public school children, approximately 39%, were transported to their schools by bus in 1969–1970 in all parts of the country.

The importance of bus transportation as a normal and accepted tool of educational policy is readily discernible in this and the companion case, *Davis, supra.*[11] The Charlotte school authorities did not purport to assign students on the basis of geographically drawn zones until 1965 and then they allowed almost unlimited transfer privileges. The District Court's conclusion that assignment of children to the school nearest their home serving their grade would not produce an effective dismantling of the dual system is supported by the record.

Thus the remedial techniques used in the District Court's order were within that court's power to provide equitable relief; implementation of the decree is well within the capacity of the school authority.

The decree provided that the buses used to implement the plan would operate on direct routes. Students would be picked up at schools near their homes and transported to the schools they were to attend. The trips for elementary school pupils average about seven miles and the District Court found that they would take "not over 35 minutes at the most."[12] This system compares favorably with the transportation plan previously operated in Charlotte under which each day 23,600 students on all grade levels were transported an average of 15 miles one way for an average trip requiring over an hour. In these circumstances, we find no basis for holding that the local school authorities may not be required to employ bus transportation as one tool of school desegregation. Desegregation plans cannot be limited to the walk-in school.

An objection to transportation of students may have validity when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process. District courts must weigh the soundness of any transportation plan in light of what is said in subdivisions (1), (2), and (3) above. It hardly needs stating that the limits on time of travel will vary with many factors, but probably with none more than the age of the students. The reconciliation of competing values in a desegregation case is, of course, a difficult task with many sensitive facets but fundamentally no more so than remedial measures courts of equity have traditionally employed.

---

[11] During 1967–1968, for example, the Mobile board used 207 buses to transport 22,094 students daily for an average round trip of 31 miles. During 1966–1967, 7,116 students in the metropolitan area were bused daily. In Charlotte-Mecklenburg, the system as a whole, without regard to desegregation plans, planned to bus approximately 23,000 students this year, for an average daily round trip of 15 miles. More elementary school children than high school children were to be bused, and

cause there was no "affirmative duty to integrate the schools in the absence of a finding of unconstitutional segregation." *Washington v. Seattle School District,* —— U.S. ——, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). In so doing, the four dissenters cited with approval the case upon which this opinion strongly relies, *Swann, supra.*

Thus we read *Washington v. Seattle School District* as unanimous on the crucial issue in our present Nashville case.

four- and five-year-olds travel the longest routes in the system.

[12] The District Court found that the school system would have to employ 138 more buses than it had previously operated. But 105 of those buses were already available and the others could easily be obtained. Additionally, it should be noted that North Carolina requires provision of transportation for all students who are assigned to schools more than one and one-half miles from their homes. N.C. Gen.Stat. § 115–186(b) (1966).

*Swann, supra* at 29–31, 91 S.Ct. at 1282–1283.

**9.** The Circuit Courts generally have disapproved desegregation plans that do not include all grades in the school system, often noting that *Brown v. Board of Education* itself involved segregated elementary schools. "It is axiomatic that black students, particularly in the elementary grades, suffer irreparable harm from the maintenance of a segregated school system." *United States v. School District of Ferndale*, 577 F.2d 1339 (6th Cir. 1978). In *Haycraft v. Board of Education*, 585 F.2d 803, 805 (6th Cir. 1979), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3107, 61 L.Ed.2d 879 (1979), this court rejected a plan that exempted first-graders from busing, saying, "To exempt first grade students from busing would leave vestiges of segregation intact contrary to this Court's mandate." The District Court found that first graders would be subject to "a high risk of failure" if forced to participate in a busing program, but this court found such arguments an insufficient basis for exclusion. In *Lee v. Macon County Board of Education*, 616 F.2d 805 (5th Cir. 1980), the Fifth Circuit disapproved a neighborhood school plan in a case much like *Kelley*. In *Lee*, grades K–5 would attend neighborhood schools with the result that two-thirds of elementary black students would attend schools more than 95% black. The District Judge had based his remedy on findings that attending a school near home was important for young children and that pairing would interfere with individualized instruction. The appellate court held these reasons "legally insufficient."

> If the decision were ours initially, we might pay greater heed to the education disadvantages of the rapid dismantling of a dual school system. We may not, however, weigh advantages against disadvantages, for that judicial balancing has already been accomplished. The law orders eradication of all vestiges of the dual system, if some feasible plan can be devised.

616 F.2d at 811 (citing *Swann* 402 U.S. at 15, 91 S.Ct. at 1275).

The court said despite the school board's "apparent good faith attempt to desegregate in 1970," the system had never become a unitary one. Therefore, the duty to dismantle the dual school system continued, and residential patterns could not serve to justify racial imba-

The Court's approval of transportation for elementary students illustrates the fact that these groups of children are not automatically or easily exempted from a busing program. Only when "the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process" should elementary children be omitted from a busing plan. No such showing was made or required by the District Court in this case.[9]

lance. In rejecting the District Court's plan, the *Lee* court noted that the temporary or permanent presence of one or more racially identifiable elementary schools, or even an omission of some of the earlier grades from a busing program, *might* be permissible. It stressed the need, however, for detailed fact-findings indicating the circumstances motivating "any variations from complete desegregation of Tuscaloosa's schools." *Id.* at 812.

Numerous other courts have reached similar conclusions. In *Keyes v. School District No. 1*, 521 F.2d 465 (10th Cir. 1975), *cert. denied*, 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976), the Tenth Circuit rejected a "part-time" desegregation program for elementary students. The District Court had permitted children to spend part of the school day at their neighborhood schools, citing a need for recreational, extra-curricular and parental activities. In disapproving this plan, the appeals court stated, "although we acknowledge such neighborhood contact to be important, we cannot place it above the constitutional rights of children to attend desegregated schools. We perceive those rights to include full-time attendance in a desegregated setting." *Keyes* at 478. *See also Adams v. United States*, 620 F.2d 1277 (8th Cir.), *cert. denied*, 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980); *Anderson v. Dougherty City Bd. of Educ.*, 609 F.2d 225 (5th Cir. 1980); *Mills v. Polk County Bd. of Educ.*, 575 F.2d 1146 (5th Cir. 1978); *United States v. Texas Ed. Agency*, 532 F.2d 380 (5th Cir.), *vacated and remanded on other grounds*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), *concepts reaffirmed*, 564 F.2d 162 (5th Cir. 1977); *Clark v. Bd. of Educ.*, 465 F.2d 1044 (8th Cir. 1972), *cert. denied*, 413 U.S. 923, 93 S.Ct. 3054, 37 L.Ed.2d 1044 (1973); and *Flax v. Potts*, 464 F.2d 865 (5th Cir. 1972), *cert. denied*, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972).

Also instructive is the Supreme Court's treatment of *Estes v. Metropolitan Branches of the Dallas NAACP*, 444 U.S. 437, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980) (opinion below at 572 F.2d 1010). The Fifth Circuit had rejected the District Court's plan for desegregating Dallas on the basis that it left existing a large number of one-race schools (defined as more than 75%

In sum, while neighborhood schools may be desirable in a school system free of a history of segregation, where such a history exists, a plan must do more; it must make "every effort to achieve the greatest possible degree of actual desegregation." Some inconvenience and even awkward remedies may be necessary where neutral assignment plans fail to desegregate the schools.[10]

Because the remedy leaves elementary schools highly segregated, the District Court's approval of a neighborhood school plan for grades K–4 is rejected. On remand, the District Judge is instructed to include these children within a pupil assignment program drafted in compliance with this opinion, except where inclusion would "risk the health of the children or significantly impinge on the educational process" within the meaning of Swann.

It appears to this court that Nashville has some great advantages for solving the desegregation problem. It is a far more compact city than, for example, Cleveland or Detroit, and in general, the schools in need of desegregation are centrally located. Of

equally great importance, the school system is organized on a Davidson County-wide basis. We approve the Board's and District Court's intention to apply the desegregation plan to the entire county.

As we have shown above, we are convinced the District Court's approval of the Board's plan was legal error.[11] In addition, we recognize the lower court's approval was based in part on a conviction, with which we take issue, that desegregation has not advanced the educational achievement levels of black children and that it is a serious "education cost" in the elementary grades. It was largely for these reasons, along with a fear of increased "white flight," [12] that Judge Wiseman was persuaded to deviate from a Swann-type remedy. See 492 F.Supp. at 189–92. While doubtless the jury on the educational benefits of desegregation will be out for a long time, recent findings indicate results directly contrary to the views expressed by the District Judge. Some of this material is very current and therefore was unavailable to Judge Wiseman at the time his opinions were written.[13] We note these findings only because of the

one-race). Under the District Court's plan, grades K–3 remained in neighborhood schools, and no busing of high school students was ordered; these limitations were largely based on the District Court's concerns over resegregation, community support, and the social and educational consequences of extensive busing. The Fifth Circuit remanded and ordered the court to rezone or to provide time and distance studies that would explain failure to use pairing and clustering or busing to eliminate the one-race schools. The Supreme Court granted certiorari to consider "the need to eliminate one-race schools through further busing"; however, the writ was later dismissed as improvidently granted. Justices Powell, Rehnquist and Stewart dissented from the dismissal, stressing a need to affirm the District Court's "sensitive" and "promising" plan. The dismissal, however, indicates the remaining members of the court disagreed. The withdrawal of certiorari suggests, particularly in the face of the dissent, that the majority approved the Fifth Circuit's handling of the District Court's plan. In line with the Fifth Circuit, we are ordering the lower court to eliminate as far as possible the one-race or virtually one-race schools and to explain with "time and distance studies" or by reference to "natural boundaries or traffic patterns" why elimination is not feasible for any remaining schools.

10. See Swann, supra 402 U.S. at 28, 91 S.Ct. at 1282.

11. The dissent suggests that we have not employed an abuse of discretion standard in reviewing the District Court's plan. "Improper application of the law, however, is itself an abuse of discretion. An appellate court may reverse if the decision below was based on an erroneous view of the law. . . ." United States v. School District of Ferndale, 577 F.2d 1339 (6th Cir. 1978).

12. Where the Board and court are under a duty to dismantle a dual system, white flight cannot be used to justify a failure to meet the obligation. In United States v. Scotland Neck Board of Education, 407 U.S. 484, 491, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1972), the Supreme Court states: "While this development [white flight] may be cause for deep concern to the respondents, it cannot, as the Court of Appeals recognized, be accepted as a reason for achieving anything less than complete uprooting of the dual public school system."

13. These findings can be found in the Appendix to this opinion.

District Court's strong reliance on this matter. We also note and take this opportunity to remind the District Court that the issue of achievement scores is constitutionally irrelevant in a school system with a history of illegal segregation.

## REMAINING ISSUES

We now turn to other issues advanced by plaintiffs' appeal. First, it is urged that the approved plan places a disproportionate burden of busing on black middle school students. Any intentional effort to make the transportation burden fall more heavily on one race than on the other would, of course, be violative of basic constitutional law. Many factors, however, must be taken into account in working out a practical assignment system, including availability of schools, locations of schools, ease of travel between specific neighborhoods and specific schools, and the facilities for education existing in such schools. By mentioning these factors, we do not by any means attempt to exhaust the list; the foregoing are cited purely for illustration. With regard to the plaintiffs' middle school busing burden issue, we are unable to find the District Judge's disposition of this issue either clearly erroneous as to facts or in violation of law. It is obvious, however, that our rejection of the 15% either race minority presence as a desegregation standard will necessitate a substantial revision of the middle school busing program. Thus, the above is suggested as guidance to the District Judge in weighing a new plan.

■ Plaintiffs also urge the retention of Pearl High School as a senior high, objecting to its use as a middle school under the Board's plan. We, like the District Judge, sympathize with plaintiffs' argument for retention of Pearl as a high school because of its "historic contribution to the black community of Nashville," 492 F.Supp. at 184. We do not find, however, that the School Board's decision, as affirmed by the District Judge, to convert Pearl into a middle school and to build a new Pearl-Cohn comprehensive high school to be based on clearly erroneous findings or founded in a racially discriminatory purpose. Under these circumstances, we are not empowered to overturn the apparently nondiscriminatory educational decision here involved.

As to plaintiffs' last issues, however, we feel quite differently. Plaintiffs' argument that faculty and staff assignments have been made on a racially discriminatory basis should long ago have been the subject of hearing and decision. Faculty desegregation is a considerably easier task than is overall desegregation of schools. Similarly, we believe that there long ago should have been a hearing on plaintiffs' motion for attorneys' fees and expenses. Finally, we observe that plaintiffs' charges of contempt against the defendants should not be left in limbo.

From this distance, we can make no judgment on these matters since no factual record has been written. The District Court, however, should give prompt attention to all three of these issues. The delays in this case suggest that absolute priority be accorded to this litigation until a unitary system has been achieved.

The dissent in this case is in utter disregard of the Supreme Court's interpretation of the Constitution of the United States in such cases as *Brown, supra; Green, supra; Swann, supra; Keyes, supra; Penick v. Columbus Bd. of Educ., supra;* and *Dayton II, supra.* It goes without saying that this court is required to follow constitutional law as defined by the Supreme Court of the United States. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958).

The judgment of the District Court is affirmed in part, reversed in part, and remanded for proceedings not inconsistent with this decision.

## APPENDIX

After this case was argued in this court, a study made under the auspices of Vanderbilt University and now published in the nine volume ASSESSMENT OF CURRENT KNOWLEDGE ABOUT THE EFFECTIVENESS OF

SCHOOL DESEGREGATION STRATEGIES (Vanderbilt Univ. 1981) [hereinafter cited as DESEGREGATION STRATEGIES] was released. The Vanderbilt project was financed with federal funds and incorporates the work of nationally prominent experts in the school desegregation field. It concludes that desegregation raises the level of black achievement, with specific findings on the Nashville schools, and emphasizes the importance of including primary grades in a desegregation plan. Significant findings include the following:

1. "It seems reasonably clear that minority children who attend school with white children perform better on standardized achievement tests than do children who attend segregated schools." 2 DESEGREGATION STRATEGIES at 33. See also Crain & Mahard, *Desegregation and Black Achievement: A Review of the Research*, 42 LAW & CONTEMP. PROB. 17 (Summer 1978). For example, a study of Nashville elementary schools revealed that black children's test scores rose an average of .28 when placed in desegregated schools. This amounts to a little over ³/₁₀ths of a grade level and was termed a "sizeable" achievement gain. 5 DESEGREGATION STRATEGIES at 184. It also is estimated that desegregation tends to raise black achievement by approximately four IQ points.

2. To boost achievement, desegregation must occur in the early grades.

The findings that strong effects of desegregation occur in the earliest grades are a strong argument against delaying desegregation past grade one. Only a few school systems leave the early primary grades segregated; the most significant is Dallas. Our analysis indicates that this is a very unfortunate policy. Many school systems leave kindergarten students segregated. This analysis suggests it would be academically very beneficial to include minority kindergarten students in a desegregation plan.

Id. at 185.

The study concludes that desegregation "creates a sudden burst of achievement growth" during the early grades and that after that time, desegregated students maintain but do not increase this higher level of achievement. The study also notes, "[N]o desegregation plan where elementary grades are excluded can effectively reduce racial isolation. Moreover, the research suggests that desegregation at early grades holds the greatest promise for improving race relations, increasing minority achievement and ultimately reducing racial prejudice." *Id.* at 70.

3. Racial proportions in the school are related to achievement. The study suggests that minority students score higher when they are in predominantly anglo classrooms; however, it is important that more than a small number of minority students attend majority schools. Where minority students comprise less than 15% of the school's population, little mixing of races occurs, and where blacks make up less than 20% of a high school's population, black male achievement suffers. *Id.* at 115, 173, 186 and 196.

4. Where a school district is organized on a county-wide basis, as is the Nashville-Davidson County school system, "white flight" has much less long-term impact on the schools. *Id.* at 47.

A 1981 study by the National Assessment of Educational Progress, a federally sponsored group that annually tests 9-, 13- and 17-year-olds, reports that black achievement scores have increased significantly over the past 10 years. In an assessment of reading performance, the study found that while black students still scored below white students, they had narrowed the gap considerably. For example, 9-year-old black students were 14.2 percentage points below the national norm in 1971 in literal comprehension, but in 1980 black students were only 7.1 percentage points below the national average. This result was achieved in the face of an overall achievement gain for *all* tested students. Black students scored achievement gains at all three age groups, although increases were more significant for the 9- and 13-year-olds than for the 17-year-olds.

This black achievement gain extends from reading into other disciplines, according to Burton & Jones, *Recent Trends in Achievement Levels of Black/White Youth*, EDUCATIONAL RESEARCHER (April 1982). That article analyzes tests administered over five subject areas from 1969 to 1980 by the National Assessment of Educational Progress and concludes:

> For the learning areas other than writing, the average difference between white and black 9-year-olds has shrunk from about 17 percentage points to 10 or 11 over the 1970s. At age 13 (Figure 5) mathematics is relatively the most difficult area for black students. For the areas other than mathematics, means for 13-year-old black students were 17 to 18 percentage points below those for white students in 1970, but only 12 to 13 points below by 1980. A decrease in the difference between white and black students over time is evident at both ages.

> \*     \*     \*     \*     \*     \*

> Typically, when achievement for white students has declined, that for black students has declined less; when whites have improved, blacks have improved more. The difference between the races has decreased at both ages in mathematics, science, reading, writing and social studies.

*Id.* at 11–12, 14.

Neither the National Assessment project nor authors Burton and Jones go so far as directly to attribute black achievement gains to desegregation. It is stated, however, that the findings "cast doubt on judgments that these social programs have failed." Burton and Jones, *supra* at 10.

These recent studies, published after the District Judge's decision, undercut his finding that the black-white achievement gap has narrowed only "slightly" and that improvement had plateaued in 1975. *See* 492 F.Supp. at 190–91 n. 46. On the contrary, the impact of these studies is that desegregation raises the level of black achievement.

CELEBREZZE, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's decision to affirm the educational components of the district court's plan: the establishment of remediation programs, the creation of a magnet school at West End Junior High School, and the development of an Afro-American studies program. I disagree, however, with my distinguished colleagues and the portion of the decision that reverses the district court's pupil assignment plans. After a careful reading of the record in this case, I believe that the Davidson County community, the board of education, and the district judge are making significant progress towards affording a constitutionally acceptable educational system and that this court should allow the local community and federal court to proceed with their innovations and programs. In my view, the district court did not make clearly erroneous findings of fact and did not abuse its discretion in forming its remedy.

I.

This appeal is part of a desegregation case which has spanned a generation and raises issues concerning the breadth of the district court's discretion and the scope of this court's review. A brief examination of the district court's conclusions is, therefore, necessary.

In 1971, after sixteen years of litigation, the district court adopted a comprehensive desegregation plan which required an "ideal student ratio" of 15 to 35 percent black students in each school and ordered substantial additional busing for the 1971–72 academic year. This court affirmed the 1971 order, reasoning that the decision was within the discretion of the district court. *Kelley v. Metropolitan County Board of Education*, 463 F.2d 732 (6th Cir. 1972). The litigation continued intermittently through the 1970's and, in 1979, the district court ordered the parties to reconsider the 1971 desegregation plan in light of the disparate busing burdens, the need to expand the geographic scope of the remedy, and changes in the racial composition of and distribution in the community.

The district court held extensive hearings concerning the effectiveness of the 1971 remedy. The school board established a citizens' advisory panel and a planning team which included outside consultants; after a series of public meetings, the board proposed a new desegregation plan. The plaintiffs responded with objections, recommendations, and suggestions for the district court. The district court heard expert testimony and considered various studies concerning test scores, transportation burdens, and white flight, as well as the social, economic, and educational costs of competing desegregation plans.

In evaluating the possible desegregation remedies, the district court made extensive findings of fact. The court found that the Nashville and Davidson County school system had experienced significant white flight under the 1971 busing order.[1] The court further found that white flight was expected to continue so that 25 to 30 percent of the county's elementary school children would be in private schools by the middle or late 1980's. It emphasized that the flight stemmed largely from the public's perception that the system's educational quality was poor. Second, the court found that although test scores for black and white pupils had improved under the 1971 plan, the gap between the scores of the two groups had remained constant. Third, the district court found that the school board's proposed desegregation plan placed a disparate burden on black children, especially those in the early elementary grades, by requiring that black children be bused in numbers disproportionate to their share of the population. Fourth, the district court found that extensive busing plans would have substantial social, economic, and educational costs. 492 F.Supp. at 189–92; 479 F.Supp. at 122–23.

Based on these findings, the district court outlined specific guidelines for a new desegregation plan for the county. Initially, the court extended the geographic reach of the plan to include the entire county.[2] It ordered the school board to send children in grades K to 4 to neighborhood schools, maximizing the desegregation within this limitation.[3] It ordered that in grades 5 to 8, the objective should be a minimum presence of 15 percent of either race in each school.[4] In addition, the district court outlined various changes in curriculum, staff, and programs for the Nashville school system.

1. The extent of white flight under the 1971 busing remedy has apparently been substantial. In June, 1971, 66,393 white students attended Metropolitan Nashville schools; in June, 1979, the number had dropped to 44,295. Based on several empirical studies, the district court concluded that the decline was, at least in part, the result of white flight and the resegregation from the 1971 busing order. 492 F.Supp. at 189‑90; 479 F.Supp. at 122–123.

2. Because of the vast distances in Davidson County, the district court limited the 1971 busing remedy to the densely populated core of the County. After finding that this limitation was hindering the implementation of an effective desegregation remedy, the district court ordered the school board in 1979 to devise a new plan which extended the geographic scope of the busing plan. 479 F.Supp. at 122–23.

3. In deciding that children in grades K to 4 should go to neighborhood schools, the district court noted that "an objection to transportation of students may have validity when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process." *Swann v. Charlotte-Mecklenburg Board of Education,*

402 U.S. 1, 30–31, 91 S.Ct. 1267, 1282–1283, 28 L.Ed.2d 554 (1971). The district court relied on its detailed findings of fact and concluded that neighborhood schools were necessary for children in grades K to 4.

4. The district court observed that:

The selection of 15 percent is arbitrary, as is any other number which may be chosen. Preparation of students to live in a pluralistic society makes a biracial, intercultural experience highly desirable. However, it was not the intent of Brown and its progeny to require blacks always to be in the minority; nor should these precedents have been read to require assimilation or amalgamation. It is not undemocratic, nor does it violate equal protection of the laws to have a system that allows for recognition of and respect for differences in our society. A rigid adherence to racial ratios premised upon the social goal of assimilation, which in the process demeans, diminishes, or benignly neglects cultural and ethnic pride as well as differences, is not only constitutionally unrequired, but socially undesirable.

492 F.Supp. at 193.

## II.

I believe that the majority opinion does not adequately address the district court's findings of fact. With regard to factual questions in desegregation cases, the question on review is whether the findings of fact are clearly erroneous. Fed.R.Civ.P. 52(a). *See Dayton Board of Education v. Brinkman*, 443 U.S. 526, 534 n.8, 99 S.Ct. 2971, 2977, 61 L.Ed.2d 720 (1979) (*Dayton II*). This court may not reverse findings of fact unless it is left with the firm conviction that a mistake has been made. *Alexander v. Youngstown Board of Education*, 675 F.2d 787, 795–96 (6th Cir. 1982). *See, e.g., Reed v. Rhodes*, 607 F.2d 714, 717 (6th Cir. 1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980); *Penick v. Columbus Board of Education*, 583 F.2d 787, 789, 798 (6th Cir. 1978), *aff'd*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). This court may not deviate from that standard when it addresses factual findings with which it is vaguely dissatisfied. *See Dayton II*, 443 U.S. at 540, 99 S.Ct. at 2980.

The majority opinion does not subject the district court's findings concerning disparate busing burdens on black children, loss of community support, heavy economic expenses, and significant educational costs under the 1971 plan to careful scrutiny to determine whether they are clearly erroneous. For example, the majority requires the district court to include children in grades K to 4 in its busing plan unless inclusion would "risk the health of the children or significantly impinge on the educational process." *Swann*, 402 U.S. at 30–31, 91 S.Ct. at 1282–1283. The district court, however, did make findings concerning the educational effects of the remedy on young school children and expressly noted the *Swann* exception.[5] In addition, rather than evaluate the findings concerning white flight and its pertinence to the district court's choice of remedy, *see* notes 1–2, *supra*, the majority simply rejects the notion that the threat of flight is a valid reason for failing to adopt any desegregation plan, a question not presented here.[6]

As this court has been previously admonished by the Supreme Court:

[o]n appeal, the task of a court of appeals is defined with relative clarity; it is confined by law and precedent, just as are those of the district courts and of this

---

5. 492 F.Supp. at 189–92. *See* note 3, and accompanying text, *supra*.

6. The threat of white flight may not, of course, be the basis for obstructing a desegregation remedy once a constitutional violation has been found. *See, e.g., Monroe v. Board of Commissioners*, 391 U.S. 450, 459, 88 S.Ct. 1700, 1704, 20 L.Ed.2d 733 (1968). The concern for white flight in cases where a *Swann* remedy has been in operation for some time, as here, does not reflect an attempt to defeat desegregation efforts, but is considered so that the plan will be effective in the long run.

*United States v. Scotland Neck City Board of Education*, 407 U.S. 484, 491, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1972), indicates that the risk of white flight does not permit a school board to avoid the responsibility of eliminating a dual school system. A district court, however, may consider such a risk in selecting the most desirable plan from among several constitutionally permissible desegregation remedies. In *Stout v. Jefferson County Board of Education*, 537 F.2d 800 (5th Cir. 1976), the Fifth Circuit, in examining the application of *Scotland Neck*, stated:

We have found no authority declaring that in choosing between various *permissible* plans a chancellor may not elect to minimize white boycotts. The teaching of *Scotland Neck* is that he may not refuse to adopt a permissible plan and elect or confect one which preserves a dual system because of such fears. The true issue, then, is whether the plan adopted by the court below was, given the circumstances, a permissible one. *Id.* at 802. In this case, the district court evaluated the risk of white flight in determining the *scope* of its busing remedy, not in determining whether to afford a remedy at all. These are entirely separate questions. Other courts have held that the threat of flight is a proper consideration in framing a permissible desegregation plan. *See Johnson v. Board of Education of Chicago*, 604 F.2d 504, 517 (7th Cir. 1979), *vacated for consolidation* —— U.S. ——, 102 S.Ct. 2223, 72 L.Ed.2d 668 (1982) (a school board may "consider the probability of white flight in formulating a remedial plan to prevent de facto segregation in public schools"); *Parent Ass'n of Andrew Jackson High School v. Ambach*, 598 F.2d 705, 719 (2nd Cir. 1979); *Higgins v. Board of Education of the City of Grand Rapids*, 508 F.2d 779, 794 (6th Cir. 1974).

Court. If it concludes that the findings of the district court are clearly erroneous, it may set them aside under Fed.Rule Civ.Proc. 52(a). If it decides that the district court has misapprehended the law, it may accept that court's findings of fact but reverse its judgment because of legal errors. Here, however, as we conceive the situation, the Court of Appeals did neither. It was vaguely dissatisfied with the limited character of the remedy which the district court had afforded plaintiffs, and proceeded to institute a far more sweeping one of its own, without in any way upsetting the district court's findings of fact or reversing its conclusions of law. *Dayton I*, 433 U.S. at 417–18 [97 S.Ct. at 2774].

After carefully examining the record and extensive findings of fact in this case, especially those concerning population shifts, educational quality, transportation burdens, and social costs, I am not left with conviction that the district court's factual findings are clearly erroneous.

### III.

Furthermore, I believe that the majority has erred in its review of the district court's desegregation remedy. When reviewing a district court's desegregation remedy, we are limited to determining whether the district court abused its discretion.[7] *See Milliken v. Bradley*, 433 U.S. 267, 281, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977); *Swann,*

402 U.S. at 15, 25, 27, 30, 91 S.Ct. at 1275, 1280, 1281, 1282. The Supreme Court has identified the standard for review as the traditional abuse of discretion measure applied to equitable decrees: in a desegregation case, "the scope of a district court's equitable power to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable decrees." *Swann*, 402 U.S. at 15, 91 S.Ct. at 1275. This discretion comports with the policy of leaving the administration of desegregation plans with the district courts.[8] "Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these [desegregation] cases can best perform this judicial appraisal." *Brown II [v. Board of Education of Topeka]*, 349 U.S. 294 at 299–300, 75 S.Ct. 753 at 755–756, 99 L.Ed. 1083.

I disagree with the majority's view of the district court's discretion. The majority implies that the district court is obligated to employ a racial ratio which matches the racial composition of the Davidson County school system. My reading of *Swann* is that the district court *may* adopt such a ratio as part of a desegregation remedy. The Constitution does not require the district court to use a ratio which mirrors the racial makeup of the community. *Swann*, 402 U.S. at 23–24, 91 S.Ct. at 1279–1280. Rather, the district court may use its discre-

---

7. The courts of appeals have held that the standard of review in a desegregation case is whether the district court abused its discretion. *E.g., United States v. Board of School Comm'rs of Indianapolis*, 637 F.2d 1101, 1116 (7th Cir.), *cert. denied*, 449 U.S. 838, 101 S.Ct. 114, 66 L.Ed.2d 45 (1980); *Evans v. Buchanan*, 582 F.2d 750, 760 (3rd Cir. 1978) (en banc), *cert. denied*, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980); *Stout v. Jefferson County Board of Education*, 489 F.2d 97, 98 (5th Cir. 1974) (per curiam); *Kelly v. Guinn*, 456 F.2d 100, 110 (9th Cir. 1972), *cert. denied*, 413 U.S. 919, 93 S.Ct. 3048, 37 L.Ed.2d 1041 (1979). *See also Arthur v. Nyquist*, 636 F.2d 905, 906 (2nd Cir. 1981).

8. This court may reverse a district court in its formulation of a desegregation remedy only when it has abused its discretion, because the district court is in the best position to weigh the competing equities.

The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

*Hecht Co. v. Bowles*, 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–592, 88 L.Ed. 754 (1944), cited in *Brown II*, 349 U.S. at 300, 75 S.Ct. at 756, and *Swann*, 402 U.S. at 15, 91 S.Ct. at 1275. *See Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1972) ("[i]n shaping equitable decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow").

tion to determine the proper scope of a busing plan in a desegregation remedy.[9]

The majority's treatment of the pupil assignment component of the desegregation plan is not consistent with the limited scope of our review. The district court did use in 1971, as a "starting point," the approximate racial ratio of the school district as an objective for its busing plan. The district court in 1980 reviewed the effectiveness of the 1971 order. After hearing and evaluating a broad range of evidence concerning white flight, test scores, transportation burdens, costs, education theory, and other factors, the district court changed the busing objective to a minimum presence of 15 percent of either race.

The majority opinion seems to recognize that there is no constitutional right to any particular racial balance in schools. *See Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 434, 96 S.Ct. 2697, 2703, 49 L.Ed.2d 599 (1976) (no "substantive constitutional right to a particular degree of racial balance or mixing" exists); *Swann*, 402 U.S. at 24, 91 S.Ct. at 1280. Yet the majority's requirement that the district court employ a ratio of 68 percent white and 32 percent black (plus or minus 15 percent) appears to be an attempt to establish such a balance. I fear that the precise racial mixture required by the majority on remand will, as a practical matter, create such a right. *See Dayton Board of Education v. Brinkman*, 433 U.S. 406, 418, 97 S.Ct.

2766, 2774, 53 L.Ed.2d 581 (1977) (*Dayton I*).

Moreover, I disagree with the majority's treatment of the pupil assignment component for grades K to 4. The majority rejects the district court's decision on the premise that it is required to desegregate all schools and all grades within the school system. I do not believe that the district court's discretion is so narrow. The cases on which the majority relies for its proposition do not support its conclusion.[10] In *Haycraft v. Board of Education of Jefferson County*, 585 F.2d 803 (6th Cir. 1978), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3107, 61 L.Ed.2d 879 (1979), this court reversed a district court which excluded first grade students from a busing plan. In *Haycraft*, the district court made no factual findings; instead, it concluded "as a matter of law" that first grade students without kindergarten experience would risk failure if they rode on a bus to school. *Id.* at 804. Here, the district court made extensive factual findings, supported by the record, and grounded his decision on the risk that the entire desegregation remedy might fail in the long run if very young children were included in the busing program. 492 F.Supp. at 189–93. *Lee v. Macon County Board of Education*, 616 F.2d 805 (5th Cir. 1980), does not hold that every grade in a school system must be included in a desegregation remedy. In fact, the Fifth Circuit reasons that "[f]ocusing on the target of a

---

9. The Eighth Circuit has expressly rejected the argument that the desegregation plan for the St. Louis school system must precisely reflect the racial composition of the district. The district court adopted a pupil assignment plan which considered schools with black enrollment of 30 to 50 percent (plus or minus 15 percent) in a system which is 76 percent black. The appellate court found that such deviations are within the discretion of the district court. *Liddell v. Board of Education of St. Louis*, 667 F.2d 643, 649 (8th Cir. 1981).

10. The majority's reliance on *Tasby v. Estes*, 572 F.2d 1010 (5th Cir. 1978), *cert. dismissed as improvidently granted*, 444 U.S. 437, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980), is misplaced. First, the circuit court did not hold that *Swann* requires all schools and all grades to be included in a pupil assignment program. It remanded

the case because the district court, unlike the lower court in this case, failed to make adequate factual findings. *Id.* at 1014. Second, the Fifth Circuit has expressly ruled that a district court "may devise a constitutional plan that temporarily or permanently leaves one or more racially identifiable elementary schools, or that omits some of the earlier grades from the busing program." *Lee v. Macon County Board of Education*, 616 F.2d 805, 812 (5th Cir. 1980). Third, the Supreme Court's decision to dismiss certiorari as improvidently granted provides no indication of the Court's view of the merits and gives the *Estes* decision no precedential power binding on this court. *See Griffin v. United States*, 336 U.S. 704, 716, 69 S.Ct. 814, 819, 93 L.Ed. 993 (1958); *United States v. Carver*, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361 (1923).

unitary system rather than a systemwide racial balance, the court may devise a constitutional plan that temporarily or permanently leaves one or more racially identifiable elementary schools, or that omits some of the earlier grades from the busing programs." *Id.* at 812. *See generally Swann,* 402 U.S. at 24, 91 S.Ct. at 1280 ("[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole").

Finally, the majority fails to address directly the issue of the effectiveness of the desegregation plan.[11] "The measure of any desegregation plan is its effectiveness." *Davis v. School Comm'rs of Mobile,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1291, 28 L.Ed.2d 577 (1971). District court decrees must ultimately be evaluated on the basis of their effectiveness. *See Green v. County School Board,* 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968) (desegregation remedies must be drawn "in light of the circumstances present and the options available"); *Davis,* 402 U.S. at 37, 91 S.Ct. at 1291 (desegregation remedies must "tak[e] into account the practicalities of the situation"). An effective desegregation plan is one which will establish a unitary school system: "The obligation of the district courts . . . is to assess the effectiveness of a proposed plan in achieving desegregation." *Green,* 391 U.S. at 439, 88 S.Ct. at 1694. Many factors should be considered in determining whether a particular plan will be effective in establishing a unitary school system. These factors include population shifts,[12] transportation burdens, and the social, economic, and educational costs of competing desegregation plans. The precise weight to be accorded to each factor should be left to the district court's discretion. In my opinion, the district court has properly identified and weighed these various factors and has selected a desegregation remedy which is likely to move Davidson County towards a unitary school system.[13] If lasting solutions for the problems of desegregation are to be found, we must allow the district courts to shape remedies which reflect the practical problems facing a school system and which have a realistic chance of achieving the goals of *Brown I.*

A careful reading of the entire record, and my experience with the previous appeals filed in this litigation, leads me to believe that Judge Wiseman has addressed a difficult problem and is, together with the local community, making a sincere effort to bring a degree of finality to this longstanding issue. I believe that the district court's plan complies with the requirements of *Brown I* and *Swann.* The district court's

---

11. The Supreme Court's opinion in *Washington v. Seattle School District No. 1,* —— U.S. ——, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), does not address the issues raised in this appeal. In *Washington,* the Court found that a state referendum which prohibits mandatory busing of school children for purposes of integration violates the equal protection clause of the fourteenth amendment. *Washington* concerns the structure of the state and local political process, rather than the breadth of a district court's discretion in shaping a desegregation decree: "[i]t is the State's race-conscious restructuring of its decisionmaking process that is impermissible." —— U.S. ——, —— n.29, 102 S.Ct. 3187, 3203 n.29. The Supreme Court has recently reiterated the policy of encouraging flexibility in desegregation remedies and avoiding rigid approaches: "although 'in some circumstances busing will be an appropriate and useful element in a desegregation plan,' in other circumstances 'its "costs," both in financial and educational terms, will render its use inadvisable.'" *Crawford v. Los Angeles Board of*

*Education,* —— U.S. ——, ——, 102 S.Ct. 3211, 3220, 72 L.Ed.2d 948 (1982), *quoting Crawford v. Board of Education,* 17 Cal.3d 280, 309, 139 Cal.Rptr. 724, 551 P.2d 28 (1976). *See at* —— n.3, —— n.15, 102 S.Ct. at 3214 n.3, 3218 n.15.

12. *See* notes 1 and 6 and accompanying text, *supra.*

13. The majority relies on *Tasby v. Estes,* 572 F.2d 1010 (5th Cir. 1978), *cert. dismissed as improvidently granted,* 444 U.S. 437, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980), asserting that the dismissal of certiorari as improvidently granted is an indication that the Supreme Court supports the majority's interpretation of *Swann.* Although the Court's disposition allows no such inference to be drawn, *see* note 10, *supra,* Justice Powell's dissent, joined by Justices Rehnquist and Stewart, is of interest. The dissent emphasizes the need for flexibility and practicality in reviewing desegregation decrees.

findings of fact are not clearly erroneous and it has not abused its broad discretion in fashioning the flexible and innovative plan presented to this court. Accordingly, I would affirm the judgment of the district court.